# IN THE SUPREME COURT OF TEXAS

No. 08-0964

THE EDWARDS AQUIFER AUTHORITY
AND THE STATE OF TEXAS, PETITIONERS,

v.

BURRELL DAY AND JOEL McDANIEL, RESPONDENTS

ON PETITION FOR REVIEW FROM THE
COURT OF APPEALS FOR THE FOURTH DISTRICT OF TEXAS

**Argued February 17, 2010**

JUSTICE HECHT delivered the opinion of the Court.

We decide in this case whether land ownership includes an interest in groundwater in place that cannot be taken for public use without adequate compensation guaranteed by article I, section 17(a) of the Texas Constitution.[1] We hold that it does. We affirm the judgment of the court of appeals[2] and remand the case to the district court for further proceedings.

## I

In 1994, R. Burrell Day and Joel McDaniel (collectively, "Day") bought 381.40 acres on

---

[1] TEX. CONST. art. I, § 17(a) ("No person's property shall be taken, damaged, or destroyed for or applied to public use without adequate compensation being made . . . .").

[2] *Edwards Aquifer Auth. v. Day*, 274 S.W.3d 742 (Tex. App.–San Antonio 2008).

which to grow oats and peanuts and graze cattle. The land overlies the Edwards Aquifer, "an underground layer of porous, water-bearing rock, 300-700 feet thick, and five to forty miles wide at the surface, that stretches in an arced curve from Brackettville, 120 miles west of San Antonio, to Austin."[3] A well drilled in 1956 had been used for irrigation through the early 1970s, but its casing collapsed and its pump was removed sometime prior to 1983. The well had continued to flow under artesian pressure, and while some of the water was still used for irrigation, most of it flowed down a ditch several hundred yards into a 50-acre lake on the property. The lake was also fed by an intermittent creek, but much of the water came from the well. Day's predecessors had pumped water from the lake for irrigation. The lake was also used for recreation.

To continue to use the well, or to drill a replacement as planned, Day needed a permit from the Edwards Aquifer Authority. The Authority had been created by the Edwards Aquifer Authority Act ("the EAAA" or "the Act") in 1993, the year before Day bought the property.[4] The Edwards Aquifer is "the primary source of water for south central Texas and therefore vital to the residents,

---

[3] *Edwards Aquifer Auth. v. Chem. Lime, Ltd.*, 291 S.W.3d 392, 394 (Tex. 2009).

[4] Act of May 30, 1993, 73d Leg., R.S., ch. 626, 1993 Tex. Gen. Laws 2350, amended by Act of May 16, 1995, 74th Leg., R.S., ch. 524, 1995 Tex. Gen. Laws 3280; Act of May 29, 1995, 74th Leg., R.S., ch. 261, 1995 Tex. Gen. Laws 2505; Act of May 6, 1999, 76th Leg., R.S., ch. 163, 1999 Tex. Gen. Laws 634; Act of May 25, 2001, 77th Leg., R.S., ch. 1192, 2001 Tex. Gen. Laws 2696; Act of May 28, 2001, 77th Leg., R.S., ch. 966, §§ 2.60-.62 and 6.01-.05, 2001 Tex. Gen. Laws 1991, 2021-2022, 2075-2076; Act of May 25, 2001, 77th Leg., R.S., ch. 1192, 2001 Tex. Gen. Laws 2696; Act of June 1, 2003, 78th Leg., R.S., ch. 1112, § 6.01(4), 2003 Tex. Gen. Laws 3188, 3193; Act of May 23, 2007, 80th Leg., R.S., ch. 510, 2007 Tex. Gen. Laws 900; Act of May 28, 2007, 80th Leg., R.S., ch. 1351, §§ 2.01-2.12, 2007 Tex. Gen Laws 4612, 4627-4634; Act of May 28, 2007, 80th Leg. R.S., ch. 1430, §§ 12.01-12.12, 2007 Tex. Gen. Laws 5848, 5901-5909; Act of May 21, 2009, 81st Leg., R.S., ch. 1080, 2009 Tex. Gen. Laws 2818 [hereinafter "EAAA"]. Citations are to the EAAA's current sections, without separate references to amending enactments. The EAAA remains uncodified, but an unofficial compilation can be found on the Authority's website, at http://www.edwardsaquifer.org/files/EAAact.pdf.

industry, and ecology of the region, the State's economy, and the public welfare."[5] The Legislature

determined that the Authority was "required for the effective control of the resource to protect

terrestrial and aquatic life, domestic and municipal water supplies, the operation of existing

industries, and the economic development of the state."[6]

The Act "prohibits withdrawals of water from the aquifer without a permit issued by the

Authority".[7] The only permanent exception is for wells producing less than 25,000 gallons per day

for domestic or livestock use.[8] The Act gives preference to "existing user[s]" — defined as persons

who "withdr[ew] and beneficially used underground water from the aquifer on or before June 1,

1993"[9] — and their successors and principals. With few exceptions, water may not be withdrawn

from the aquifer through wells drilled after June 1, 1993.[10] Each permit must specify the maximum

rate and total volume of water that the water user may withdraw in a calendar year,[11] and the total

of all permitted withdrawals per calendar year cannot exceed the amount specified by the Act.[12]

---

[5] *Chem. Line*, 291 S.W.3d at 394.

[6] EAAA § 1.01.

[7] *Chem. Line*, 291 S.W.3d at 394 (citing EAAA § 1.15(b) ("Except as provided by Sections 1.17 ['Interim Authorization'] and 1.33 [wells producing less than 25,000 gallons per day for domestic or livestock use] of this article, a person may not withdraw water from the aquifer or begin construction of a well or other works designed for the withdrawal of water from the aquifer without obtaining a permit from the authority.") and EAAA § 1.35(a) ("A person may not withdraw water from the aquifer except as authorized by a permit issued by the authority or by this article.")).

[8] *Id*. at 394 n.10.

[9] *Id.* at 395 (quoting EAAA § 1.03(10)).

[10] EAAA § 1.14(e).

[11] EAAA § 1.15(d).

[12] EAAA 1.14(c) (formerly EAAA 1.14(b)); *see also Chem. Line*, 291 S.W.3d at 395 n.8 (providing the history of 1.14(b) and (c)).

A user's total annual withdrawal allowed under an "initial regular permit" ("IRP") is calculated based on the beneficial use of water without waste during the period from June 1, 1972, to May 31, 1993.[13] The Act, like the Water Code, defines beneficial use as "the use of the amount of water that is economically necessary for a purpose authorized by law, when reasonable intelligence and reasonable diligence are used in applying the water to that purpose."[14] Although other provisions of the Water Code governing groundwater management districts define beneficial use more broadly and include recreational purposes,[15] they also state that "any special law governing a specific district shall prevail".[16] "Waste" is broadly defined.[17]

---

[13] EAAA § 1.16(a) ("An existing user may apply for an initial regular permit by filing a declaration of historical use of underground water withdrawn from the aquifer during the historical period from June 1, 1972, through May 31, 1993."); *id.* § 1.16(e) ("To the extent water is available for permitting, the board shall issue the existing user a permit for withdrawal of an amount of water equal to the user's maximum beneficial use of water without waste during any one calendar year of the historical period. If a water user does not have historical use for a full year, then the authority shall issue a permit for withdrawal based on an amount of water that would normally be beneficially used without waste for the intended purpose for a calendar year.").

[14] EAAA § 1.03(4); *see also* TEX. WATER CODE § 11.002(4) ("'Beneficial use' means use of the amount of water which is economically necessary for a purpose authorized by this chapter, when reasonable intelligence and reasonable diligence are used in applying the water to that purpose and shall include conserved water.").

[15] TEX. WATER CODE § 36.001(9) ("'Use for a beneficial purpose' means use for: (A) agricultural, gardening, domestic, stock raising, municipal, mining, manufacturing, industrial, commercial, recreational, or pleasure purposes; (B) exploring for, producing, handling, or treating oil, gas, sulphur, or other minerals; or (C) any other purpose that is useful and beneficial to the user.").

[16] *Id.* § 36.052(a).

[17] EAAA § 1.03(21) ("'Waste' means: (A) withdrawal of underground water from the aquifer at a rate and in an amount that causes or threatens to cause intrusion into the reservoir of water unsuitable for agricultural, gardening, domestic, or stock raising purposes; (B) the flowing or producing of wells from the aquifer if the water produced is not used for a beneficial purpose; (C) escape of underground water from the aquifer to any other reservoir that does not contain underground water; (D) pollution or harmful alteration of underground water in the aquifer by salt water or other deleterious matter admitted from another stratum or from the surface of the ground; (E) willfully or negligently causing, suffering, or permitting underground water from the aquifer to escape into any river, creek, natural watercourse, depression, lake, reservoir, drain, sewer, street, highway, road, or road ditch, or onto any land other than that of the owner of the well unless such discharge is authorized by permit, rule, or order issued by the commission under Chapter 26, Water Code; (F) underground water pumped from the aquifer for irrigation that escapes as irrigation tailwater onto land other than that of the owner of the well unless permission has been granted by the occupant of the land receiving

A user's total permitted annual withdrawal cannot exceed his maximum beneficial use during any single year of the historical period, or for a user with no historical use for an entire year, the normal beneficial use for the intended purpose.[18] But the total withdrawals under all permits must be reduced proportionately as necessary so as to not exceed the statutory maximum annual withdrawal from the aquifer.[19] An "existing user" who operated a well for three or more years during the historical period is entitled to a permit for at least the average amount of water withdrawn annually.[20] And every "existing irrigation user shall receive a permit for not less than two acre-feet a year for each acre of land the user actually irrigated in any one calendar year during the historical period."[21]

For various reasons, the Authority did not become operational until 1996, and all IRP applications were required to be filed before December 30, 1996.[22] Day timely applied for authorization to pump 700 acre-feet of water annually for irrigation. Attached to the application was a statement by Day's predecessors, Billy and Bret Mitchell, that they had "irrigated approximately 300 acres of Coastal Bermuda grass from this well during the drought years of 1983 and 1984." The

---

the discharge; or (G) for water produced from an artesian well, "waste" has the meaning assigned by Section 11.205, Water Code.").

[18] EAAA § 1.16(e).

[19] *Id.* ("If the total amount of water determined to have been beneficially used without waste under this subsection exceeds the amount of water available for permitting, the authority shall adjust the amount of water authorized for withdrawal under the permits proportionately to meet the amount available for permitting.").

[20] *Id.*

[21] *Id.* One acre-foot of water, enough to cover one acre one foot deep, is equal to 43,560 cubic feet or 325,851.43 gallons, slightly less than half the volume of an olympic-size swimming pool (660,430 gallons).

[22] *Edwards Aquifer Auth. v. Chem. Lime, Ltd.*, 291 S.W.3d 392, 396, 402 (Tex. 2009).

application's request for 700 acre-feet appears to have been based on two acre-feet for the total beneficial use of irrigating the 300 acres plus the recreational use of the 50-acre lake.

In December 1997, the Authority's general manager wrote Day that the Authority staff had "preliminarily found" that his application "provide[d] sufficient convincing evidence to substantiate" the irrigation of 300 acres in 1983-1984 and thus an average annual beneficial use of 600 acre-feet of water during the historical period. The letter invited Day to submit additional information, but he did not respond. In December 1999, the Authority approved Day's request to amend his application to move the point of withdrawal from the existing well to a replacement well to be drilled on the property. Although the Authority cautioned that it still had not acted on the application, Day proceeded to drill the replacement well at a cost of $95,000. In November 2000, the Authority notified Day that, "[b]ased on the information available," his application would be denied because "withdrawals [from the well during the historical period] were not placed to a beneficial use".

Day protested the Authority's decision, and the matter was transferred to the State Office of Administrative Hearings for hearing. During discovery, Billy Mitchell testified at his deposition that in 1983 and 1984, an area totaling only about 150 acres had been irrigated, that this had been done using an agricultural sprinkler system that drew water from the lake, and that no more than seven acres had been irrigated with water directly from the well. Day offered no other evidence of beneficial use during the historical period.[23] The administrative law judge concluded that water from

---

[23] Day offered a record of the United States Geological Survey Department to show that the well had pumped 39 million gallons in 1972 and 13.l million gallons in 1973, but the mere fact that water may have been pumped from the well does not prove beneficial use, and in any event, Day did not base his application on any such use of water in

the lake, including the well water that had flowed into it, was state surface water, the use of which could not support Day's application for groundwater, and that the recreational use of the lake was not a beneficial use as defined by the EAAA. The ALJ found that the maximum beneficial use of groundwater shown by Day during the historical period was for the irrigation of seven acres of grass and concluded that Day should be granted an IRP for 14 acre-feet of water. The Authority agreed.

Day appealed the Authority's decision to the district court and also sued the Authority for taking his property without compensation in violation of article I, section 17(a) of the Texas Constitution, and for other constitutional violations. The Authority impleaded the State as a third-party defendant, asserting indemnification and contribution for Day's taking claim.[24] The court granted summary judgment for Day on his appeal, concluding that water from the well-fed lake used to irrigate 150 acres during the historical period was groundwater, and that Day was entitled to an IRP based on such beneficial use. The court granted summary judgment for the Authority on all of Day's constitutional claims, including his takings claim. The court remanded the case to the Authority for issuance of a new IRP.

---

1972-1973.

[24] The State argues for the first time in this Court that only the Authority, an independent political subdivision, can be liable to Day on his takings claim, and therefore the State is immune from the Authority's third-party suit. The Authority responds that it was required by state law to act as it did and that it is the EAAA itself, rather than the Authority's actions under it, that resulted in any taking liability. Because the issue was not developed below and has not been fully briefed in this Court, we decline to address it.

Day and the Authority appealed. The court of appeals agreed with the Authority that groundwater from the well became state surface water in the lake and could not be considered in determining the amount of Day's IRP.[25] Thus, the court affirmed the Authority's decision to issue Day a permit for 14 acre-feet. But the court held that "landowners have some ownership rights in the groundwater beneath their property . . . entitled to constitutional protection",[26] and therefore Day's takings claim should not have been dismissed. Rejecting Day's other constitutional arguments, the court remanded the case to the district court for further proceedings.

The Authority, the State, and Day each petitioned for review. We granted all three petitions.[27] We begin by considering whether, under the EAAA, the Authority erred in limiting Day's IRP to 14 acre-feet and conclude that it did not. Next, we turn to whether Day has a constitutionally protected interest in the groundwater beneath his property and conclude that he does. We then consider whether the Authority's denial of an IRP in the amount Day requested constitutes a taking and conclude that the issue must be remanded to the trial court for further proceedings. We end with Day's other constitutional arguments, concluding that they are without merit.

---

[25] *Edwards Aquifer Auth. v. Day*, 274 S.W.3d 742, 753-755 (Tex. App.–San Antonio 2008).

[26] *Id*. at 756.

[27] 53 Tex. Sup. Ct. J. 230 (Jan. 15, 2010). The following have filed amici curiae briefs in support of the Authority and the State: Alliance of EAA Permit Holders; Angela Garcia and Environmental Defense Fund, Inc.; City of San Antonio by and through the San Antonio Water System; Harris-Galveston Subsidence District; Medina County Irrigators Alliance; and Texas Alliance of Groundwater Districts. The following have filed amici curiae briefs in support of Day: Glenn and JoLynn Bragg; Canadian River Municipal Water Authority; City of Amarillo; City of El Paso; Anne Windfohr Marion and the Tom L. and Anne Burnett Trust; Mesa Water, L.P.; Pacific Legal Foundation; Texas Cattle Feeders Association; Texas Farm Bureau; Texas Landowners Council; Texas and Southwestern Cattle Raisers Association; and Texas Wildlife Association. The following have also filed amici curiae briefs: City of Victoria; the Texas Comptroller of Public Accounts; and Senator Robert Duncan.

8

**II**

Day contends that the Authority was required to base his IRP on his predecessors' beneficial use of water drawn from the lake, supplied in part by the well, to irrigate 150 acres for two years during the historical period. The Authority counters that the lake water, whatever its origin, was state surface water and could not be considered in determining the amount of the IRP.

The Water Code defines state water — water owned by the State — as "[t]he water of ordinary flow, underflow, and tides of every flowing river, natural stream, and lake, and of every bay or arm of the Gulf of Mexico, and the storm water, floodwater, and rainwater of every river, natural stream, canyon, ravine, depression, and watershed in the state".[28] Day argues that because groundwater — defined by the Code as "water percolating below the surface of the earth"[29] — is not included in this list, it can never be state water. But the character of water as groundwater or state water can change. The Code recognizes this reality, providing, for example, that storm water or floodwater — state water — when "put or allowed to sink into the ground, . . . loses its character and classification . . . and is considered percolating groundwater."[30] By the same token, irrigation runoff draining into a stream or other watercourse wholly loses its character as groundwater and becomes state water.

---

[28] TEX. WATER CODE § 11.021(a). Such water "is the property of the state." *Id.*; *see also Goldsmith & Powell v. State*, 159 S.W.2d 534, 535 (Tex. Civ. App.–Dallas 1942, writ ref'd).

[29] TEX. WATER CODE § 35.002(5).

[30] *Id.* § 11.023(d).

There is an exception. Groundwater can be transported through a natural watercourse without becoming state water. The Code specifically allows the Water Commission to authorize a person to discharge privately owned groundwater into a natural watercourse and withdraw it downstream.[31] But this exception proves the rule. The necessary implication is that when the water owner has not obtained the required authorization for such transportation, the water in the natural watercourse becomes state water. Before such authorization was required,[32] we, too, acknowledged the propriety of transporting non-state-owned water by natural watercourse, but only when the water owner controls the discharge and withdrawal so that the water moves directly from the source to use.[33]

In this case, Day's predecessors did not measure the amount of water flowing from the well to the lake or the amount pumped from the lake into the irrigation system. There was no direct transportation from source to use; the flow into the lake was as constant as the artesian pressure allowed, except when water was diverted to irrigate the seven acres, while withdrawal was only periodic as needed to irrigate the 150 acres. Nor does it appear that the lake was used to store water for irrigation. While the water remained in the lake, it was used for recreation, and since most of

---

[31] *Id.* § 11.042(b) ("A person who wishes to discharge and then subsequently divert and reuse the person's existing return flows derived from privately owned groundwater must obtain prior authorization from the commission for the diversion and the reuse of these return flows. The authorization may allow for the diversion and reuse by the discharger of existing return flows, less carriage losses, and shall be subject to special conditions if necessary to protect an existing water right that was granted based on the use or availability of these return flows. Special conditions may also be provided to help maintain instream uses and freshwater inflows to bays and estuaries. A person wishing to divert and reuse future increases of return flows derived from privately owned groundwater must obtain authorization to reuse increases in return flows before the increase.").

[32] Section 11.042(b) was adopted by Act of June 1, 1997, 75th Leg., R.S., ch. 1010, § 2.06, 1997 Tex. Gen. Laws 3610, 3620.

[33] *City of Corpus Christi v. City of Pleasanton*, 276 S.W.2d 798, 802-803 (Tex. 1955).

10

the water in the lake came from the well, that appears to have been its principal purpose. Indeed, there is no evidence that lake water was used for irrigation during the historical period other than in 1983 and 1984, while the lake was used constantly for recreation. This was substantial evidence to support the Authority's finding that the groundwater became state water in the lake. We do not suggest that a lake can never be used to store or transport groundwater for use by its owner.[34] We conclude only that the Authority could find from the evidence before it that that was not what had occurred on Day's property.

Day having offered no other evidence of beneficial use during the historical period, the Authority's decision to issue an IRP for 14 acre-feet must be affirmed.

### III

Whether groundwater can be owned in place is an issue we have never decided. But we held long ago that oil and gas are owned in place, and we find no reason to treat groundwater differently.

### A

We agree with the Authority that the rule of capture does not require ownership of water in place, but we disagree that the rule, because it prohibits an action for drainage, is antithetical to such ownership.

We adopted the rule of capture in 1904 in *Houston & T.C. Railway v. East*.[35] A well on East's homestead, five feet in diameter and thirty-three feet deep, had long supplied him with water for household purposes. But the Railroad dug a well nearby, twenty feet in diameter and sixty-six

---

[34] A lake was used for part of the groundwater transportation in *City of Corpus Christi*, 276 S.W.2d at 799.

[35] 81 S.W. 279 (Tex. 1904).

11

feet deep, from which it pumped 25,000 gallons a day for use in its locomotives and machine shops, and East's well dried up. East sued the Railroad for the destruction of his well. After a bench trial, the trial court found that the Railroad's use of water was unreasonable under riparian law, but concluded it was not actionable,[36] and rendered judgment for the Railroad. The court of appeals reversed and rendered judgment for East for the damages claimed, $206.25.[37] The Railroad appealed.

"Under the common law . . . , a riparian use must be a reasonable one, and . . . [a] use which works substantial injury to the common right as between riparians is an unreasonable use . . . ."[38] The issue before us was whether this law applied. The same issue had been considered by the English Court of the Exchequer in *Acton v. Blundell*.[39] As in *East*, a landowner had sued for damage to his well from wells dug nearby,[40] and the question was "whether the right to the enjoyment of an underground spring, or of a well supplied by such underground spring, is governed by the same rule

---

[36] *Id.* at 280 ("I further find that the use to which defendant puts its well was not a reasonable use of their property as land, but was an artificial use of their property, and if the doctrine of reasonable use, as applicable to defined streams, is applied to such cases, this was unreasonable.").

[37] *Id.*

[38] *Motl v. Boyd*, 286 S.W. 458, 470 (Tex. 1926) (internal citations omitted).

[39] (1843) 152 Eng. Rep. 1123 (Exch.); 12 Mees & W. 324.

[40] *Id*. at 1232-1233 ("At the trial the plaintiff proved that, within twenty years before the commencement of the suit, viz., in the latter end of 1821, a former owner and occupier of certain land and a cotton-mill, now belonging to the plaintiff, had sunk and made in such land a well for raising water for the working of the mill; and that the defendants, in the year 1837, had sunk a coal-pit in the land of one of the defendants, at about three quarters of a mile from the plaintiff's well, and about three years after sunk a second, at a somewhat less distance; the consequence of which sinking was, that by the first the supply of water was considerably diminished, and by the second was rendered altogether insufficient for the purposes of the mill.").

of law as that which applies to, and regulates, a watercourse flowing on the surface."[41] That rule was

"well established":

> each proprietor of the land has a right to the advantage of the stream flowing in its
> natural course over his land, to use the same as he pleases, for any purposes of his
> own, not inconsistent with a similar right in the proprietors of the land above or
> below; so that, neither can any proprietor above diminish the quantity or injure the
> quality of the water which would otherwise naturally descend, nor can any proprietor
> below throw back the water without the license or the grant of the proprietor above.[42]

After considering the basis for the rule, the consequences of applying it to groundwater, and such

authorities as it could find, the court concluded that the law governing the use of groundwater should

be different.[43] The court stated the applicable rule as follows:

> That the person who owns the surface may dig therein and apply all that is there
> found to his own purposes, at his free will and pleasure; and that if, in the exercise
> of such right, he intercepts or drains off the water collected from the underground
> springs in his neighbor's well, this inconvenience to his neighbor falls within the
> description of damnum absque injuria, which cannot become the ground of an
> action.[44]

This Court, noting that arguments regarding the applicable law had been "thoroughly presented" in

*Acton*,[45] and believing that the English court's rule had been "recognized and followed . . . by all the"

---

[41] *Id.* at 1233.

[42] *Id.*

[43] *Id.* ("But we think, on considering the grounds and origin of the law which is held to govern running streams, the consequences which would result if the same law is made applicable to springs beneath the surface, and, lastly, the authorities to be found in the books, so far as any inference can be drawn from them bearing on the point now under discussion, that there is a marked and substantial difference between the two cases, and that they are not to be governed by the same rule of law.").

[44] *Id.* at 1235.

[45] *Houst. & T.C. Ry. v. East*, 81 S.W. 279, 280 (Tex. 1904) ("The arguments in favor of the application to such cases [involving groundwater] of the doctrines applicable to defined streams of water were thoroughly presented at the bar in Acton v. Blundell, and the reasons for the conclusion of the court against such application were carefully stated

courts of last resort in this country before which the question has come, except the Supreme Court

of New Hampshire",[46] adopted the rule for Texas.  We later came to refer to the rule as the "rule or

law of capture."[47]

Under that rule, we held that the Railroad's conduct was not actionable.  "The practical

reasons" for the rule, we explained, had been summarized by the Ohio Supreme Court in *Frazier*

*v. Brown*:[48]

> In the absence of express contract and a positive authorized legislation, as between
> proprietors of adjoining land, the law recognizes no correlative rights in respect to
> underground waters percolating, oozing, or filtrating through the earth; and this
> mainly from considerations of public policy: (1) Because the existence, origin,
> movement, and course of such waters, and the causes which govern and direct their
> movements, are so secret, occult, and concealed that an attempt to administer any set
> of legal rules in respect to them would be involved in hopeless uncertainty, and
> would, therefore, be practically impossible. (2) Because any such recognition of
> correlative rights would interfere, to the material detriment of the commonwealth,
> with drainage and agriculture, mining, the construction of highways and railroads,
> with sanitary regulations, building, and the general progress of improvement in
> works of embellishment and utility.[49]

By "correlative rights", we referred specifically to the right East claimed: to sue for damages from

a loss of water due to subsurface drainage by another user for legitimate purposes.  The reasons the

law did not recognize that right — the "hopeless uncertainty" involved in its enforcement and the

---

in the opinion.").

[46] *Id.*

[47] *Elliff v. Texon Drilling Co.*, 210 S.W.2d 558, 561 (Tex. 1948).  The historical origins and development of the rule are thoroughly examined in Dylan O. Drummond, Lynn Ray Sherman & Edmond R. McCarthy, Jr., *The Rule of Capture in Texas — Still So Misunderstood After All These Years*, 37 TEX. TECH L. REV. 1, 15-41 (2004).

[48] 12 Ohio St. 294 (1861), *overruled by Cline v. Am. Aggregates Corp.*, 474 N.E.2d 324 (Ohio 1984).

[49] *East*, 81 S.W. at 280-281 (quoting *Frazier*, 12 Ohio St. at 311).

material interference with public progress — did not preclude all correlative rights in groundwater. On the contrary, we noted that East had made "no claim of malice or wanton conduct of any character, and the effect to be given to such a fact when it exists is beside the present inquiry",[50] suggesting at least the possibility that an action for damages might lie in such circumstances, despite difficulty in proof. Malice and wanton conduct were only examples. *Acton*'s rule of non-liability, we said, was a "general doctrine".[51]

The effect of our decision denying East a cause of action was to give the Railroad ownership of the water pumped from its well *at the surface*. No issue of ownership of groundwater *in place* was presented in *East*, and our decision implies no view of that issue. Riparian law, which East invoked, governs users who do not own the water. Under that law, the Railroad would have been liable even if East did not own the water in place. The Railroad escaped liability, certainly not because East did own the water in place, but irrespective of whether he did. Our quote from the New York Court of Appeals' decision in *Pixley v. Clark*[52] must be read in this context:

> An owner of soil may divert percolating water, consume or cut it off, with impunity. It is the same as land, and cannot be distinguished in law from land. So the owner of land is the absolute owner of the soil and of percolating water, which is a part of, and not different from, the soil. No action lies against the owner for interfering with or destroying percolating or circulating water under the earth's surface.[53]

---

[50] *Id.* at 282.

[51] *Id.*

[52] 35 N.Y. 520 (1866).

[53] *East*, 81 S.W. at 280-281 (quoting *Pixley*, 35 N.Y. at 527).

15

Whatever the New York court may have intended by this statement,[54] we could have meant only that a landowner is the absolute owner of groundwater flowing at the surface from its well, even if the water originated beneath the land of another.

In four cases since *East*, we have considered the rule of capture as applied to groundwater. In none of them did we determine whether the water was owned in place. In *City of Corpus Christi v. City of Pleasanton*,[55] the parties all owned wells pumping from the same sands. The City of Corpus Christi was using natural watercourses — the Nueces River and Lake Corpus Christi — to transport its water 118 miles from its wells to the point where it withdrew the water for use. The other well owners complained that the loss of water along the way to evaporation, transpiration, and seepage was waste, and that water reserves for all the wells were being depleted unnecessarily because the City was taking much more water than it used. We reaffirmed that, under the rule of capture, "percolating waters are regarded as the property of the owner of the surface",[56] but as in *East*, the water ownership to which we referred was at the surface, not in place. "The precise question" in *East*, we said, was "whether the Railway Company was liable in damages to East" for

---

[54] The issue in *Pixley* was whether landowners who raised their dam on a creek were liable for flooding other landowners adjacent the creek. The court held they were, applying the law governing riparian use, not the law governing the use of groundwater. *Pixley*, 35 N.Y. at 531-532. The statement quote is dicta apparently meant to distinguish between the two.

[55] 276 S.W.2d 798 (Tex. 1955).

[56] *Id.* at 800.

its use of water.[57]  *East* established

> that an owner of land had a legal right to take all the water he could capture under his land that was needed by him for his use, even though the use had no connection with the use of the land as land and required the removal of the water from the premises where the well was located.[58]

Just as the Railroad was not liable to East, the City was not liable to other well owners for the loss of water involved in its transportation.  But as we had suggested in *East*, the rule of capture was not absolute.  "Undoubtedly," we noted, "the Legislature could prohibit the use of any means of transportation of percolating or artesian water which permitted the escape of excessive amounts, but it has not seen fit to do so."[59]

In *Friendswood Development Co. v. Smith-Southwest Industries, Inc.*,[60] the Court held that a landowner pumping water from wells on its property was not liable for the resulting subsidence in neighboring property.  This result, the Court concluded, was necessitated by *East*, which had "adopted the absolute ownership doctrine of underground percolating waters."[61]  But without overruling *East*, the Court held that prospectively, a landowner could be liable for subsidence caused by removing groundwater.[62]  Avoiding the tension in these seemingly inconsistent views of *East*, Justice Pope argued convincingly in dissent that the rule of capture was irrelevant to the case and

---

[57] *Id.* at 801.

[58] *Id.* at 800.

[59] *Id.* at 803.

[60] 576 S.W.2d 21 (Tex. 1978).

[61] *Id.* at 25.

[62] *Id.* at 29-30.

17

that the Court had based its decision on "the mistaken belief that the case is governed by the ownership of ground water."[63] *East* was about liability for a loss *of* water, not liability for a loss *from* water. In any event, no claim of right to groundwater in place was made or decided.

In *City of Sherman v. Public Utility Commission*,[64] a water utility petitioned the PUC to prohibit the City of Sherman from drilling wells in the utility's service area to obtain water for the City's needs outside the area. The Court concluded that the City's activities were permitted by *East*, which had adopted an "absolute ownership theory regarding groundwater", to which "[a] corollary . . . is the right of the landowner to capture such water."[65] The PUC, we held, had no statutory authority "to regulate groundwater production or adjudicate correlative groundwater rights."[66] Rather, the Legislature had chosen to regulate groundwater use and production through groundwater districts under the Water Code.[67] The issues in the case did not implicate ownership of groundwater in place.

Finally, in *Sipriano v. Great Spring Waters of America, Inc.*,[68] we revisited the rule of capture in a factual setting virtually identical to that in *East*: landowners sued their neighbor for

---

[63] *Id.* at 31 (Pope, J., dissenting).

[64] 643 S.W.2d 681 (Tex. 1983).

[65] *Id.* at 686.

[66] *Id.*

[67] *Id.*

[68] 1 S.W.3d 75 (Tex. 1999).

pumping so much water (90,000 gallons a day) that their wells were depleted. Once again, we

explained:

> The rule of capture answers the question of what remedies, if any, a neighbor has against a landowner based on the landowner's use of the water under the landowner's land. Essentially, the rule provides that, absent malice or willful waste, landowners have the right to take all the water they can capture under their land and do with it what they please, and they will not be liable to neighbors even if in so doing they deprive their neighbors of the water's use.[69]

The right to capture was not unfettered; it precluded the plaintiffs' suit but not legislative regulation,

which we expressly recognized and encouraged.[70] The concern was that with no common law

liability for a landowner's unlimited pumping, legislators had inadequately provided for the

protection of groundwater supplies.[71] No issue regarding the ownership of groundwater in place was

involved.

But while the rule of capture does not entail ownership of groundwater in place, neither does

it preclude such ownership. Although we have never discussed this issue with respect to

groundwater, we have done so with respect to oil and gas, to which the rule of capture also applies.

In *Stephens County v. Mid-Kansas Oil & Gas Co.*,[72] Mid-Kansas, the assignee of an oil and gas

lease, argued that its interest in the minerals was not taxable because, by the rule of capture, they

---

[69] *Id.* at 76.

[70] *Id.* at 79 ("Today, again, we reiterate that the people have constitutionally empowered the Legislature to act in the best interest of the State to preserve our natural resources, including water. We see no reason . . . for the Legislature to feel constrained from taking appropriate steps to protect groundwater. Indeed, we anticipated legislative involvement in groundwater regulation in *East*: [']*In the absence . . . of positive authorized legislation,* as between proprietors of adjoining lands, the law recognizes no correlative rights in respect to underground waters percolating, oozing, or filtrating through the earth.[']" (quoting *Houst. & T.C. Ry. v. East*, 81 S.W. 279, 280 (1904))).

[71] *Id.* at 81 (Hecht, J., concurring).

[72] 254 S.W. 290 (Tex. 1923).

were "subject to appropriation, without the consent of the owner of the tract, through drainage from wells on adjacent lands."[73] The argument "lack[ed] substantial foundation", we explained, because Mid-Kansas could likewise drain oil and gas from adjacent lands.[74]

> Ultimate injury from the net results of drainage, where proper diligence is used is altogether too conjectural to form the basis for the denial of a right of property in that which is not only plainly as much realty as any other part of the earth's contents, but realty of the highest value to mankind . . . and often worth far more than anything else on or beneath the surface within the proprietor's boundaries.[75]

Ownership of gas in place did not entitle the owner to specific molecules of gas that might move beneath surface tracts but to volumes that, while they could be diminished through drainage, with "proper diligence", could also be replenished through drainage. Recapping our decision years later, we stated that while the rule of capture, "at first blush, would seem to conflict with the view of absolute ownership of the minerals in place, . . . it was otherwise decided in [*Stephens County*]."[76]

> [N]otwithstanding the fact that oil and gas beneath the surface are subject both to capture and administrative regulation, the fundamental rule of absolute ownership of the minerals in place is not affected in our state.[77]

Most recently, in *Coastal Oil & Gas Corp. v. Garza Energy Trust*,[78] we observed that "the rule of capture determines title to [natural] gas that drains from property owned by one person onto

---

[73] *Id.* at 292.

[74] *Id.*

[75] *Id.*

[76] *Elliff v. Texon Drilling Co.*, 210 S.W.2d 558, 561 (Tex. 1948).

[77] *Id*.

[78] 268 S.W.3d 1 (Tex. 2008).

property owned by another. It says nothing about the ownership of gas that has remained in place."[79]

The same is true of groundwater.

**B**

We held long ago that oil and gas are owned in place. In *Texas Co. v. Daugherty*,[80] the issue was whether an oil and gas lessee's interest was subject to ad valorem taxation. If the lessee's interest were "a mere franchise or privilege . . . with the usufructuary right . . . to appropriate a portion of such oil and gas as might be discovered," then the interest was part of the value of the land on which the landowner, not the lessee, should be taxed.[81] But we concluded that the lessee's interest was a separate, real interest, "amount[ing] to a defeasible title in fee to the oil and gas in the ground".[82] We recognized that "[b]ecause of the fugitive nature of oil and gas, some courts, emphasizing the doctrine that they are incapable of absolute ownership until captured and reduced to possession and analogizing their ownership to that of things ferae naturae," had held that oil and gas interests, unlike interests in non-fugacious minerals, were not interests in realty.[83] We thought that the rule of capture provided no "substantial ground" for treating the two kinds of interests differently.[84]

---

[79] *Id.* at 14.

[80] 176 S.W. 717 (Tex. 1915).

[81] *Id.* at 718.

[82] *Id.* at 719.

[83] *Id.*

[84] *Id.* at 719-720.

> The possibility of the escape of the oil and gas from beneath the land before being finally brought within actual control may be recognized, as may also their incapability of absolute ownership, in the sense of positive possession, until so subjected. But nevertheless, while they are in the ground, they constitute a property interest.[85]

Notwithstanding the rule of capture, we concluded, a landowner's "right to the oil and gas beneath his land is an exclusive and private property right . . . inhering in virtue of his proprietorship of the land, and of which he may not be deprived without a taking of private property."[86] Ownership of oil and gas in place is the prevailing rule among the states.[87]

Groundwater, like oil and gas, often exists in subterranean reservoirs in which it is fugacious. Unless the law treats groundwater differently from oil and gas, *Daugherty* refutes the Authority's argument that the rule of capture precludes ownership in place. The Authority contends that the rule of capture deprives a landowner's interest in groundwater of two attributes essential to the ownership of property: a right of possession (i) from which others are excluded[88] and (ii) which may be enforced. Because a landowner is not entitled to any specific molecules of groundwater or even to any specific amount, the Authority argues that the landowner has no interest that entitles him to

---

[85] *Id.* at 720.

[86] *Id.* at 722; *see also Brown v. Humble Oil & Ref. Co.*, 83 S.W.2d 935, 940 (Tex. 1935) ("The rule in Texas recognizes the ownership of oil and gas in place . . . . Owing to the peculiar characteristics of oil and gas, the foregoing rule of ownership of oil and gas in place should be considered in connection with the law of capture. This rule gives the right to produce all of the oil and gas that will flow out of the well on one's land; and this is a property right. And it is limited only by the physical possibility of the adjoining landowner diminishing the oil and gas under one's land by the exercise of the same right of capture. . . . Both rules are subject to regulation under the police power of a state.").

[87] *See* HOWARD R. WILLIAMS ET AL., OIL & GAS LAW § 203.3 (2011).

[88] *See College Sav. Bank v. Fla. Prepaid Postsecondary Educ. Expense Bd.*, 527 U.S. 666, 673 (1999) ("The hallmark of a protected property interest is the right to exclude others. That is one of the most essential sticks in the bundle of rights that are commonly characterized as property.") (internal citations and quotation marks omitted).

22

exclude others from taking water below his property and therefore no ownership in place. The

lessee in *Daugherty* made essentially the same argument, and we rejected it. Furthermore, we later

held that a landowner is entitled to prohibit a well from being drilled on other property but bottomed

in an oil and gas formation under his own — a slant or deviated well.[89] Thus, a landowner has a

right to exclude others from groundwater beneath his property, but one that cannot be used to

prevent ordinary drainage.

The Authority argues that groundwater must be treated differently because the law

recognizes correlative rights in oil and gas but not in groundwater. The Authority points to *East*'s

observation that "the law recognizes no correlative rights in respect to underground waters

percolating . . . through the earth"[90] but over-reads this statement. As we have explained above, *East*

did not rule out an action for "malice or wanton conduct",[91] including waste.[92] Likewise, the rule

of capture does not preclude an action for drainage of oil and gas due to waste, as we held in *Elliff*

*v. Texon Drilling Co.*[93] More importantly, however, the Court observed in *Elliff* that "correlative

rights between the various landowners over a common reservoir of oil or gas" have been recognized

through state regulation of oil and gas production that affords each landowner "the opportunity to

---

[89] *Hastings Oil Co. v. Tex. Co.*, 234 S.W.2d 389, 396 (Tex. 1950).

[90] *Hous.& T.C. Ry. v. East*, 81 S.W. 279, 280 (Tex. 1904) (quoting *Frazier v. Brown*, 12 Ohio St. 294, 311 (1861)).

[91] *Id.* at 282.

[92] *Sipriano v. Great Spring Waters of Am., Inc.*, 1 S.W.3d 75, 76 (Tex. 1999) (noting that the rule of capture does not insulate "malice or willful waste" from liability).

[93] 210 S.W.2d 558, 582-583 (Tex. 1949).

23

produce his fair share of the recoverable oil and gas beneath his land".[94]  Similarly, one purpose of

the EAAA's regulatory provisions is to afford landowners their fair share of the groundwater

beneath their property.  In both instances, correlative rights are a creature of regulation rather than

the common law.  In 1904, when *East* was decided, neither groundwater production nor oil and gas

production were regulated, and we indicated that limiting groundwater production might impede

public purposes.  The State soon decided that regulation of oil and gas production was essential,

adopting well-spacing regulations in 1919,[95] and it has since determined that the same is true for

groundwater production, as for example, in the EAAA.

The Authority argues that regulation of oil and gas production to determine a landowner's

fair share is based on the area of land owned and is fundamentally different from regulation of

groundwater production.  It is true, of course, that the considerations shaping the regulatory schemes

differ markedly.  The principal concerns in regulating oil and gas production are to prevent waste

and to provide a landowner a fair opportunity to extract and market the oil and gas beneath the

surface of the property.  Groundwater is different in both its source and uses.  Unlike oil and gas,

groundwater in an aquifer is often being replenished from the surface, and while it may be sold as

a commodity, its uses vary widely, from irrigation, to industry, to drinking, to recreation.

Groundwater regulation must take into account not only historical usage but future needs, including

the relative importance of various uses, as well as concerns unrelated to use, such as environmental

impacts and subsidence.  But as the State tells us in its petition: "While there are some differences

---

[94] *Id.* at 562.

[95] *Brown v. Humble Oil & Ref. Co.*, 83 S.W.2d 935, 941 (Tex. 1935).

in the rules governing groundwater and hydrocarbons, at heart both are governed by the same fundamental principle: each represents a shared resource that *must* be conserved under the Constitution."[96] In any event, the Authority's argument is that groundwater cannot be treated like oil and gas because landowners have no correlative rights, not because their rights are different. That argument fails.

Finally, the Authority argues that groundwater is so fundamentally different from oil and gas in nature, use, and value that ownership rights in oil and gas should have no bearing in determining those in groundwater. Hydrocarbons are minerals; groundwater, at least in some contexts, is not.[97] Groundwater is often a renewable resource, replenished in aquifers like the Edwards Aquifer; is used not only for drinking but for recreation, agriculture, and the environment; and though life-sustaining, has historically been valued much below oil and gas. Oil and gas are essentially non-renewable, are used as a commodity for energy and in manufacturing, and have historically had a market value higher than groundwater. But not all of these characteristics are fixed. Although today the price of crude oil is hundreds of times more valuable than the price of municipal water, the price of bottled water is roughly equivalent to, or in some cases, greater than the price of oil. To differentiate between groundwater and oil and gas in terms of importance to modern life would be difficult. Drinking water is essential for life, but fuel for heat and power, at least in this society, is also indispensable. Again, the issue is not whether there are important differences between groundwater

---

[96] State of Texas, Petition for Review at 11.

[97] *See* TEX. NAT. RESOURCES CODE § 53.1631(a) ("Unless otherwise expressly provided by statute, deed, patent, or other grant from the State of Texas, groundwater shall not be considered a mineral in any past or future reservation of title or rights to minerals by the State of Texas.").

and hydrocarbons; there certainly are. But we see no basis in these differences to conclude that the common law allows ownership of oil and gas in place but not groundwater.

In *Elliff*, we restated the law regarding ownership of oil and gas in place:

> In our state the landowner is regarded as having absolute title in severalty to the oil and gas in place beneath his land. The only qualification of that rule of ownership is that it must be considered in connection with the law of capture and is subject to police regulations. The oil and gas beneath the soil are considered a part of the realty. Each owner of land owns separately, distinctly and exclusively all the oil and gas under his land and is accorded the usual remedies against trespassers who appropriate the minerals or destroy their market value.[98]

We now hold that this correctly states the common law regarding the ownership of groundwater in place.

## C

The Legislature appears to share this view of the common law. "The ownership and rights of the owner of the land, his lessees and assigns, in underground water" were "recognized" in one provision of the Groundwater Conservation District Act of 1949 (the "GCDA"),[99] which later became section 36.002 of the Water Code.[100] That bare recognition of landowners' rights did not describe them with specificity, but last year, the Legislature amended section 36.002, to set out its fuller understanding of the matter:

---

[98] 210 S.W.2d 558, 561 (internal citations omitted).

[99] Act of May 23, 1949, 51st Leg., R.S., ch. 306, § 1, 1949 Tex. Gen. Laws 559, 562 (codified as TEX. REV. CIV. STAT. ANN. art. 7880-3c(D), later codified as TEX. WATER CODE § 52.002).

[100] Act of May 29, 1995, 74th Leg., R.S., ch. 933, § 2, 1995 Tex. Gen. Laws 4673, 4680 (adopting TEX. WATER CODE § 36.002) ("The ownership and rights of the owners of the land and their lessees and assigns in groundwater are hereby recognized, and nothing in this code shall be construed as depriving or divesting the owners or their lessees and assigns of the ownership or rights, subject to rules promulgated by a district.").

26

(a)     The legislature recognizes that a landowner owns the groundwater below the surface of the landowner's land as real property.

(b)     The groundwater ownership and rights described by this section:

(1)     entitle the landowner, including a landowner's lessees, heirs, or assigns, to drill for and produce the groundwater below the surface of real property, subject to Subsection (d), without causing waste or malicious drainage of other property or negligently causing subsidence, but does not entitle a landowner, including a landowner's lessees, heirs, or assigns, to the right to capture a specific amount of groundwater below the surface of that landowner's land; and

(2)     do not affect the existence of common law defenses or other defenses to liability under the rule of capture.[101]

By ownership of groundwater as real property, the Legislature appears to mean ownership in place.[102]

The State distinguishes its position from the Authority's. The State argues that landowners have ownership rights in groundwater but those rights are "too inchoate" to be protected by the Takings Clause of the Texas Constitution. Groundwater ownership, the State contends, cannot entitle a landowner to any specific amount of water because its availability in a rechargeable aquifer is difficult to determine and constantly changing due to climate conditions. In this same vein, amicus curiae Houston-Galveston Subsidence District argues that while groundwater rights should be severable from the land and freely transferable, the uncertainties involved in determining ownership to any amount of water preclude constitutional compensation for a taking. But the State acknowledges that its argument cannot be pushed to the extreme. Suppose a landowner were

---

[101] TEX. WATER CODE § 36.002(a)-(b).

[102] Importantly, the State does not claim to own groundwater.

prohibited from all access to groundwater.  In its brief, the State concedes: "Given that there is a

property interest in groundwater, some manner and degree of groundwater regulation could, under

some facts, effect a compensable taking of property."[103]  We agree, but the example demonstrates

the validity of Day's claim.  Groundwater rights are property rights subject to constitutional

protection, whatever difficulties may lie in determining adequate compensation for a taking.

The rest of section 36.002, not quoted here but discussed below, evidences the Legislature's

understanding of the interplay between groundwater ownership and groundwater regulation, which

forms the backdrop of the issue to which we now turn: whether Day has stated a viable takings

claim.

## IV

Day alleges that the EAAA's permitting process has deprived him of his groundwater and

therefore constitutes a taking for which compensation is due under article I, section 17 of the Texas

Constitution.  To assess this claim, we begin by surveying the history and current status of

groundwater regulation in Texas in order to place the EAAA in context, and then we turn to its

application.

## A

---

[103] Brief of Petitioner State of Texas at 26.

In 1917, following a period of severe droughts[104] and floods,[105] the people of Texas adopted article XVI, section 59 of the Texas Constitution, the Conservation Amendment. The Amendment provides in part: "The conservation and development of all of the natural resources of this State . . . are each and all hereby declared to be public rights and duties; and the Legislature shall pass all such laws as may be appropriate thereto." Thus, the "responsibility for the regulation of natural resources, including groundwater, rests in the hands of the Legislature."[106]

The Groundwater Conservation District Act of 1949 was the first significant legislation providing for the conservation and development of groundwater. Efforts to pass a comprehensive, statewide, groundwater management scheme had repeatedly failed.[107] The Act permitted landowners to petition for creation of a groundwater conservation district to regulate production from an underground reservoir. The petition was directed to the county commissioners' court if the district lay entirely within one county, or to the State Board of Water Engineers if it did not. A district was required to be approved by voters and was governed by an elected board of directors. The Act, with

---

[104] *In re Adjudication of the Water Rights of Upper Guadalupe Segment of Guadalupe River Basin*, 642 S.W.2d 438, 447 (Tex. 1982) ("The droughts in 1910 and 1917 prompted the citizens of Texas to adopt the 'Conservation Amendment' to the Texas Constitution, mandating the conservation of public waters.").

[105] *See* TEX. CONST. art. XVI, § 59 interp. commentary, at 402 (West 1993) ("Inspired by the terrific floods in Texas during 1913 and 1914, the citizens began to demand a constructive conservation program and agitated for an amendment to the constitution which would recognize the state's duty to prevent floods, or at least to take steps necessary for the conservation of the state's natural resources.").

[106] *Sipriano v. Great Spring Waters of Am., Inc.*, 1 S.W.3d 75, 77 (Tex. 1999).

[107] Edward P. Woodruff, Jr. & James Peter Williams, Jr., Comment, *Texas Groundwater District Act of 1949: Analysis and Criticism*, 30 TEX. L. REV. 862, 865-866 (1952) ("During the past fifteen years, several attempts have been made in the Legislature to provide the state with comprehensive groundwater legislation. Bills which would have accomplished this object were introduced in 1937, 1939, 1941, and in 1947. The rejection of each of these proposed measures made it apparent that if the state were to have any groundwater legislation, some retreat would have to be made from the ideal of a comprehensive code. As a result of compromises between divergent factions of groundwater users, the important and controversial Act of 1949 was passed.").

many changes, is now chapter 36 of the Water Code. There are currently ninety-six groundwater districts covering all or parts of 173 counties.[108] While districts have broad statutory authority,[109] their activities remain under the local electorate's supervision.[110]

Groundwater conservation districts have little supervision beyond the local level. Each district must develop a groundwater management plan every five years, which aims to address pertinent issues such as water supply needs, management goals, and the amount of water estimated to be used and recharged annually within the district.[111] The management plan must be submitted for approval by the Texas Water Development Board and its implementation is subject to review by the State Auditor's Office.[112] Districts are also required to participate in joint planning within designated groundwater management areas ("GMAs").[113] The regional water planning process was

---

[108] *See* TEX. WATER DEV. BD., 2012 STATE WATER PLAN 23-24 (available from the Texas Water Development Board's website, at http://www.twdb.state.tx.us/publications/state_water_plan/2012/2012_SWP.pdf).

[109] TEX. WATER CODE § 36.101(a) ("A district may make and enforce rules, including rules limiting groundwater production based on tract size or the spacing of wells, to provide for conserving, preserving, protecting, and recharging of the groundwater or of a groundwater reservoir or its subdivisions in order to control subsidence, prevent degradation of water quality, or prevent waste of groundwater and to carry out the powers and duties provided by this chapter.").

[110] *Id*. §§ 36.011-36.0171. Voter approval is often the most significant hurdle, as unwanted taxes and groundwater regulation lead to opposition to the creation of new districts. *See* TEX. COMM'N ON ENVTL. QUALITY & TEX. WATER DEV. BD., PRIORITY GROUNDWATER MANAGEMENT AREAS AND GROUNDWATER CONSERVATION DISTRICTS, REPORT TO THE 81ST TEXAS LEGISLATURE 37, tbl.6 (2009) (listing the failed GCDs since 1989), *available at* http://www.tceq.state.tx.us/assets /public/comm_exec/pubs/sfr/053_06.pdf.

[111] TEX. WATER CODE §§ 36.1072(e), 36.1071.

[112] *Id*. §§ 36.1072(a), 36.302(c).

[113] *Id*. § 35.002(11).

created in 1997,[114] and since 2001 it has included all of the major and minor aquifers in the State.[115] Now, sixteen regional groundwater management areas cover the State, with their borders mirroring those of the State's major aquifers.[116] About 80% of Texas overlies nine major aquifers and twenty minor aquifers, with the nine major aquifers providing about 97% of the State's groundwater.[117] Since 1995, groundwater conservation districts within a groundwater management area have been required to work together.[118]

Still, as chapter 36 states, "[g]roundwater conservation districts created as provided by this chapter are the state's preferred method of groundwater management through rules developed, adopted, and promulgated by a district in accordance with the provisions of this chapter."[119] Section 36.113 provides that districts must "require a permit for the drilling, equipping, operating, or completing of wells or for substantially altering the size of wells or well pumps."[120] In acting on permit requests, a district must consider, among other things, whether "the proposed use of water

---

[114] Act of June 1, 1997, 75th Leg., R.S., ch. 1010, 1997 Tex. Gen. Laws 3610.

[115] Act of May 27, 2001, 77th Leg., R.S., ch. 966, § 2.22, 2001 Tex. Gen. Laws 1991, 2003 (codified at TEX. WATER CODE § 35.004).

[116] *See generally* 31 TEX. ADMIN. CODE § 356(B); TEX. WATER DEV. BD., GROUNDWATER MANAGEMENT AREAS IN TEXAS (providing a map of the sixteen GMAs), *available at* http://www.twdb.state.tx.us/mapping/maps/pdf/GMA%20map%208x11.pdf.

[117] Ronald Kaiser, *Who Owns the Water?: A Primer on Texas Groundwater Law and Spring Flow*, TEX. PARKS & WILDLIFE, July 2005, at 33, *available at* http://www.tamu.edu/faculty/rakwater/research/tpwd_Water_Article.pdf.

[118] Act of May 29, 1995, 79th Leg., R.S., ch. 933, § 5, 1995 Tex. Gen. Laws 4673, 4688 (codified at TEX. WATER CODE § 36.108).

[119] TEX. WATER CODE § 36.0015; *cf. Sipriano v. Great Spring Waters of Am., Inc.*, 1 S.W.3d 75, 81 (Tex. 1999) (Hecht, J., concurring) ("Actually, such districts are not just the preferred method of groundwater management, they are the only method presently available.").

[120] TEX. WATER CODE § 36.113(a).

31

unreasonably affects existing groundwater and surface water resources or existing permit holders", whether "the proposed use of water is dedicated to any beneficial use", and whether "the proposed use of water is consistent with the district's approved management plan".[121] In issuing permits, a district must also "manage total groundwater production on a long-term basis to achieve an applicable desired future condition", considering estimates of groundwater availability.[122]

Districts' regulatory authority is broad:

In order to minimize as far as practicable the drawdown of the water table or the reduction of artesian pressure, to control subsidence, to prevent interference between wells, to prevent degradation of water quality, or to prevent waste, a district by rule may regulate:

(1)    the spacing of water wells by:

(A)    requiring all water wells to be spaced a certain distance from property lines or adjoining wells;

(B)    requiring wells with a certain production capacity, pump size, or other characteristic related to the construction or operation of and production from a well to be spaced a certain distance from property lines or adjoining wells; or

(C)    imposing spacing requirements adopted by the board; and

(2)    the production of groundwater by:

(A)    setting production limits on wells;

(B)    limiting the amount of water produced based on acreage or tract size;

(C)    limiting the amount of water that may be produced from a

---

[121] *Id.* § 36.113(d)(2)-(4).

[122] *Id.* § 36.1132(b)

defined number of acres assigned to an authorized well site;

> (D)    limiting the maximum amount of water that may be produced on the basis of acre-feet per acre or gallons per minute per well site per acre;

> (E)    managed depletion; or

> (F)    any combination of the methods listed above in Paragraphs (A) through (E).[123]

Section 36.116(b) provides that "[i]n promulgating any rules limiting groundwater production, the district may preserve historic or existing use before the effective date of the rules to the maximum extent practicable consistent with the district's management plan . . . and as provided by Section 36.113."[124]  In *Guitar Holding Co. v. Hudspeth County Underground Water Conservation District*,[125] we rejected the argument that a district's discretion in preserving "historic or existing use" was limited to the amount of water permitted.  Rather, we said,

> the amount of groundwater withdrawn and its purpose are both relevant when identifying an existing or historic use to be preserved.  Indeed, in the context of regulating the production of groundwater while preserving an existing use, it is difficult to reconcile how the two might be separated. . . . [B]oth the amount of water to be used and its purpose are normal terms of a groundwater production permit and are likewise a part of any permit intended to "preserve historic or existing use."  A district's discretion to preserve historic or existing use is accordingly tied both to the amount and purpose of the prior use.[126]

Districts may have different rules; indeed, a district may adopt different rules for different

---

[123] *Id.* § 36.116(a).

[124] *Id.* § 36.116(b).

[125] 263 S.W.3d 910 (Tex. 2004).

[126] *Id.* at 916.

areas of the district.[127] Special legislation, unique to each district, may also grant powers beyond those provided in chapter 36.[128]

**B**

Although the Edwards Aquifer Authority is a "conservation and reclamation district"[129] created under the Conservation Amendment,[130] its powers and duties are governed by the EAAA, not by chapter 36 of the Water Code. The EAAA does not refer to chapter 36. The Authority is responsible not only for permitting groundwater use but for "protect[ing] terrestrial and aquatic life",[131] specifically, "species that are designated as threatened or endangered under applicable federal or state law".[132]

As already noted, the EAAA requires the Authority, in issuing permits, to give preference to "existing users", considering only the amounts of groundwater put to beneficial use during the

---

[127] TEX. WATER CODE § 36.116(d) ("For better management of the groundwater resources located in a district or if a district determines that conditions in or use of an aquifer differ substantially from one geographic area of the district to another, the district may adopt different rules for: (1) each aquifer, subdivision of an aquifer, or geologic strata located in whole or in part within the boundaries of the district; or (2) each geographic area overlying an aquifer or subdivision of an aquifer located in whole or in part within the boundaries of the district.").

[128] *See, e.g.*, Act of June 18, 2005, 79th Leg., R.S., ch. 1324, § 1, 2005 Tex. Gen. Laws 4138 (creating the Corpus Christi Aquifer Storage and Recovery Conservation District); Act of June 17, 2005, 79th Leg., R.S., ch. 661, § 1, 2005 Tex. Gen. Laws 1644 (creating the Victoria County Groundwater Conservation District).

[129] EAAA § 1.02(a) ("A conservation and reclamation district, to be known as the Edwards Aquifer Authority, is created . . . .").

[130] *Id.* § 1.02(b) ("The authority is created under and is essential to accomplish the purposes of Article XVI, Section 59, of the Texas Constitution.").

[131] *Id.* § 1.01.

[132] *Id.* § 1.14(a)(7). The Legislature passed the EAAA, in part, to end federal litigation that sought judicial regulation of the Edwards Aquifer. *See, e.g., Sierra Club v. City of San Antonio*, 112 F.3d 789 (5th Cir. 1997) (vacating preliminary injunction entered pursuant to the Endangered Species Act for lack of a showing of probable success on the merits following enactment of the EAAA); *Edwards Aquifer Auth. v. Bragg*, 21 S.W.3d 375, 377 (Tex. App.– San Antonio 2000), *aff'd*, 71 S.W.3d 375 (Tex. 2002). Chapter 36 does not mention endangered species.

twenty-year historical period ending May 31, 1993. The Authority received some 1,100 IRP applications by the December 30, 1996 filing deadline, claiming 834,244 acre-feet per year, far more than the 450,000 acre-feet-per-year cap then in place. Approximately 58% of the applications were for irrigation, 20% for industrial use, 15% for municipal use, and 7% for permit-exempt domestic and livestock wells.[133] The Authority recommended denying 22% of the IRP applications and reducing the permitted amounts for 71% of the applications granted.[134] Of the total permitted annual withdrawal of 563,300 acre-feet, approximately 47% was for irrigation, 13% for industrial use, and 40% for municipal use. Some 35% of the applicants requested review.[135] (Day's contest was the first one decided.) Currently, the Authority has issued 1,975 permits to the limit of its statutory cap of 572,000 acre-feet per year.[136]

Numerous facial constitutional challenges to the EAAA were asserted in *Barshop v. Medina County Underground Water Conservation District*,[137] and we rejected them all, concluding that the EAAA "is a valid exercise of the police power necessary to safeguard the public safety and welfare."[138] One claim was that the Act's permitting process, on its face, constituted an uncompensated taking in violation of article I, section 17 of the Texas Constitution. The parties

---

[133] *See* Darcy Alan Frownfelter, *Edwards Aquifer Authority*, *in* ESSENTIALS OF TEXAS WATER RESOURCES 364-365 (Mary K. Sahs ed., 2009).

[134] *Id.* at 365-366.

[135] *Id.* at 366.

[136] EAAA § 1.14(c); Edwards Aquifer Authority, *Groundwater Permit List*, http://www.edwardsaquifer.org/ pweb/PermitList.aspx (last visited Feb. 23, 2012) (authorizing 571,599.500 acre-feet).

[137] 925 S.W.2d 618 (Tex. 1996).

[138] *Id.* at 635.

differed over whether landowners had a property right in groundwater subject to the constitutional

provision. We explained their positions as follows:

> Plaintiffs concede that the State has the right to regulate the use of underground water, but maintain that they own the water beneath their land and that they have a vested property right in this water. The State insists that, until the water is actually reduced to possession, the right is not vested and no taking occurs. Thus, the State argues that no constitutional taking occurs under the statute for landowners who have not previously captured water, while Plaintiffs argue that these landowners have had a constitutional deprivation of property rights. The parties simply fundamentally disagree on the nature of the property rights affected by this Act.[139]

Noting that we had "not previously considered the point at which water regulation unconstitutionally

invades the property rights of landowners", we concluded that that "complex and multi-faceted"

issue was not properly presented by a facial challenge to the Act.[140]

> Assuming without deciding that Plaintiffs possess a vested property right in the water beneath their land, the State still can take the property for a public use as long as adequate compensation is provided. The Act expressly provides that the Legislature "intends that just compensation be paid if implementation of [the Act] causes a taking of private property or the impairment of a contract in contravention of the Texas or federal constitution." Based on this provision in the Act, we must assume that the Legislature intends to compensate Plaintiffs for any taking that occurs. As long as compensation is provided, the Act does not violate article I, section 17.[141]

Today we have decided that landowners do have a constitutionally compensable interest in

groundwater, and we come at last to the issue not presented in *Barshop*: whether the EAAA's

regulatory scheme has resulted in a taking of that interest.

---

[139] *Id.* at 625 (citation omitted).

[140] *Id.* at 626.

[141] *Id.* at 630-631 (citation omitted) (quoting EAAA § 1.07).

## C

As we noted in *Sheffield Development Co. v. City of Glenn Heights*,[142] in construing article

I, section 17 of the Texas Constitution, we have generally been guided by the United States Supreme

Court's construction and application of the similar guarantee provided by the Fifth Amendment to

the United States Constitution and made applicable to the states by the Fourteenth Amendment.[143]

We described the foundation principle of federal regulatory takings jurisprudence as follows:

> "Government hardly could go on", wrote Justice Holmes in the first regulatory takings case in the United States Supreme Court, "if to some extent values incident to property could not be diminished [by government regulation] without paying for every such change in the general law." Yet, he continued, "a strong public desire to improve the public condition is not enough to warrant achieving the desire by a shorter cut than the constitutional way of paying for the change." "The general rule at least", he concluded, is "that while property may be regulated to a certain extent, if regulation goes too far it will be recognized as a taking", adding, "this is a question of degree — and therefore cannot be disposed of by general propositions." "[T]he question at bottom is upon whom the loss of the changes desired *should* fall."[144]

The Supreme Court has developed three analytical categories, as summarized in *Lingle v.*

*Chevron U.S.A. Inc.*:

> Our precedents stake out two categories of regulatory action that generally will be deemed *per se* takings for Fifth Amendment purposes. First, where government requires an owner to suffer a permanent physical invasion of her

---

[142] 140 S.W.3d 660 (Tex. 2004).

[143] *Id.* at 669 ("The two guarantees, though comparable, are worded differently. The Texas Constitution provides that '[n]o person's property shall be taken, damaged or destroyed for or applied to public use without adequate compensation being made . . . .' The Takings Clause of the Fifth Amendment states: 'nor shall private property be taken for public use without just compensation.' . . . [I]t could be argued that the differences in the wording of the two provisions are significant, [but absent such an argument] we . . . look to federal jurisprudence for guidance, as we have in the past . . . ." (footnotes omitted)).

[144] *Id.* at 670 (footnotes omitted) (emphasis in original) (quoting *Pa. Coal Co. v. Mahon*, 260 U.S. 393, 413, 416 (1922)).

property — however minor — it must provide just compensation. See *Loretto v. Teleprompter Manhattan CATV Corp.*, [458 U.S. 419] (1982) (state law requiring landlords to permit cable companies to install cable facilities in apartment buildings effected a taking). A second categorical rule applies to regulations that completely deprive an owner of "*all* economically beneficial us[e]" of her property. [*Lucas v. South Carolina Coastal Council*, 505 U.S. 1003, 1019 (1992) (emphasis in original).] . . .

Outside these two relatively narrow categories (and the special context of land-use exactions . . .), regulatory takings challenges are governed by the standards set forth in *Penn Central Transp. Co. v. New York City*, [438 U.S. 104] (1978). The Court in *Penn Central* acknowledged that it had hitherto been "unable to develop any 'set formula'" for evaluating regulatory takings claims, but identified "several factors that have particular significance." [*Id*., at 124.] Primary among those factors are "[t]he economic impact of the regulation on the claimant and, particularly, the extent to which the regulation has interfered with distinct investment-backed expectations." *Ibid*. In addition, the "character of the governmental action" — for instance whether it amounts to a physical invasion or instead merely affects property interests through "some public program adjusting the benefits and burdens of economic life to promote the common good" — may be relevant in discerning whether a taking has occurred. *Ibid*. The *Penn Central* factors — though each has given rise to vexing subsidiary questions — have served as the principal guidelines for resolving regulatory takings claims that do not fall within the physical takings or Lucas rules.

Although our regulatory takings jurisprudence cannot be characterized as unified, these three inquiries (reflected in *Loretto*, *Lucas*, and *Penn Central*) share a common touchstone. Each aims to identify regulatory actions that are functionally equivalent to the classic taking in which government directly appropriates private property or ousts the owner from his domain. Accordingly, each of these tests focuses directly upon the severity of the burden that government imposes upon private property rights.[145]

We followed this analytical structure in *Sheffield*, adding that all of the surrounding circumstances must be considered in applying "a fact-sensitive test of reasonableness",[146] but in the end, "whether

---

[145] 544 U.S. 528, 538-539 (2005) (citations omitted).

[146] *Sheffield*, 140 S.W.3d at 672 (quoting *City of Coll. Station v. Turtle Rock Corp.*, 680 S.W.2d 802, 804 (Tex.1984) (internal quotation marks omitted).

the facts are sufficient to constitute a taking is a question of law."[147]

The first category — involving a physical invasion of property — does not apply to the present case. It is an interesting question, and one we need not decide here, whether regulations depriving a landowner of all access to groundwater — confiscating it, in effect — would fall into the category. The EAAA does not restrict landowners' access to as much as 25,000 gallons of groundwater a day for domestic and livestock use.[148] Also, we have held that Day is entitled to a permit for fourteen acre-feet of water per year for irrigation.

With respect to the second category — for a deprivation of all economically beneficial use of property — and the first of the three *Penn Central* factors for the third category — the economic impact on the claimant — the summary judgment record before us is inconclusive. Day's permit will not allow him to irrigate as much as his predecessors, who used well water flowing into the lake. By making it much more expensive, if not impossible, to raise crops and graze cattle, the denial of Day's application certainly appears to have had a significant, negative economic impact on him, though it may be doubted whether it has denied him *all* economically beneficial use of his property.

The second *Penn Central* factor — the interference with investment-backed expectations — is somewhat difficult to apply to groundwater regulation under the EAAA. Presumably, Day knew before he bought the property that the Act had passed the year before and could have determined from the same investigation he made later that he could not prove much historical use of

---

[147] *Id.* at 673 (quoting *Mayhew v. Town of Sunnyvale*, 964 S.W.2d 922, 933 (Tex.1998)).

[148] EAAA §§ 1.15(b), 1.16(c), 1.33.

groundwater to obtain a permit. Had all this information demonstrated that his investment in the property was not justified, one could argue that he had no reasonable expectation with which the EAAA could interfere. But the government cannot immunize itself from its constitutional duty to provide adequate compensation for property taken through a regulatory scheme merely by discouraging investment. While Day should certainly have understood that the Edwards Aquifer could not supply landowners' unlimited demands for water, we cannot say that he should necessarily have expected that his access to groundwater would be severely restricted. We underscore "necessarily" because there is little in the record to illuminate what his expectations were or reasonably should have been. In any event, no single *Penn Central* factor is determinative; all three must be evaluated together, as well as any other relevant considerations.

The third *Penn Central* factor focuses on the nature of the regulation and is not as factually dependent as the other two. Unquestionably, the State is empowered to regulate groundwater production. In *East*, we concluded that there were no correlative rights in groundwater "[i]n the absence of . . . legislation",[149] suggesting that legislation would be permitted. A few years later, the Conservation Amendment made groundwater regulation "the responsibility . . . of the Legislature."[150] Groundwater provides 60% of the 16.1 million acre-feet of water used in Texas each year.[151] In many areas of the state, and certainly in the Edwards Aquifer, demand exceeds supply. Regulation is essential to its conservation and use.

---

[149] *Hous.& T.C. Ry. v. East*, 81 S.W. 279, 280 (Tex. 1904).

[150] *Sipriano v. Great Spring Waters of Am., Inc.*, 1 S.W.3d 75, 77 (Tex. 1999).

[151] *See* TEX. WATER DEV. BD., 2012 STATE WATER PLAN 163.

As with oil and gas, one purpose of groundwater regulation is to afford each owner of water in a common, subsurface reservoir a fair share.[152] Because a reservoir's supply of oil or gas cannot generally be replenished, and because oil and gas production is most commonly used solely as a commodity for sale, land surface area is an important metric in determining an owner's fair share. Reasonable regulation aims at allowing an owner to withdraw the volume beneath his property and sell it. Groundwater is different. Aquifers are often recharged by rainfall, drainage, or other surface water. The amount of groundwater beneath the surface may increase as well as decrease; any volume associated with the surface is constantly changing. Groundwater's many beneficial uses — for drinking, agriculture, industry, and recreation — often do not involve a sale of water. It value is realized not only in personal consumption but through crops, products, and diversion. Groundwater may be used entirely on the land from which it is pumped, or it may be transported for use or sale elsewhere. Consequently, regulation that affords an owner a fair share of subsurface water must take into account factors other than surface area.

As explained above, chapter 36 gives groundwater conservation districts the discretion in regulating production to "preserve historic or existing use".[153] In *Guitar Holding*, district rules required that a groundwater permit amount be based on the applicant's use of water for irrigation during a specified historical period. Guitar Holding, one of the largest landowners in the county,

---

[152] *See Elliff v. Texon Drilling Co.* 210 S.W.2d 558, 562 (Tex. 1948) ("[O]ur courts, in decisions involving well-spacing regulations of our Railroad Commission, have frequently announced the sound view that each landowner should be afforded the opportunity to produce his fair share of the recoverable oil and gas beneath his land . . . .").

[153] TEXAS WATER CODE § 36.116(b).

had irrigated only a small part of its land during the period.[154] When the district's rules took effect, the permits Guitar Holding received were limited in amount. Others who had irrigated more obtained permits for greater amounts. Meanwhile, a market for transporting water for consumption outside the district had developed, and landowners were turning from irrigation to selling water in the new market. Guitar Holding complained that the rules preserved only historic *amounts*, not historic *use*, and gave those who had used water for irrigation a perpetual franchise to transport it for sale. We agreed that "use" under the statute included purpose as well as amount.[155]

As we have seen, chapter 36 requires groundwater districts to consider several factors in permitting groundwater production, among them the proposed use of water, the effect on the supply and other permittees, a district's approved management plan.[156] By contrast, the EAAA requires that permit amounts be determined based solely on the amount of beneficial use during the historical period and the available water supply. Under the EAAA, a landowner may be deprived of all use of groundwater other than a small amount for domestic or livestock use,[157] merely because he did not use water during the historical period. The Authority argues that basing permits on historical use is sound policy because it recognizes the investment landowners have made in developing groundwater resources. But had the permit limitation been anticipated before the EAAA was passed, landowners would have been perversely incentivized to pump as much water as possible,

---

[154] *Guitar Holding Co. v. Hudspeth Cnty. Underground Water Conservation Dist.*, 263 S.W.3d 910, 914-915 (Tex. 2008).

[155] *Id.* at 916.

[156] TEX. WATER CODE § 36.113(d)(2)-(4).

[157] EAAA §§ 1.15(b), 1.16(c), and 1.33.

even if not put to best use, to preserve the right to do so going forward. Preserving groundwater for future use has been an important strategy for groundwater rights owners. For example, amicus curiae Canadian River Municipal Water Authority argues that it has acquired groundwater rights to protect supplies for municipal use but has not produced them, waiting instead until they become necessary. The Authority's policy argument is flawed.

The Authority argues that this use-it-or-lose-it limitation is legally justified by *In re Adjudication of the Water Rights of the Upper Guadalupe Segment of the Guadalupe River Basin.*[158] There we held that landowners who had not used water from the Upper Guadalupe River during a five-year historical period could be denied a permit for such water. We had previously upheld the cancellation of permits for use of river water after ten years' non-use.[159] But riparian rights are usufructuary, giving an owner only a right of use,[160] not complete ownership. Furthermore, non-use of groundwater conserves the resource, "whereas[] the non-use of appropriated waters is equivalent to waste."[161] To forfeit a landowner's right to groundwater for non-use would encourage waste.

As already discussed, the Legislature last year amended section 36.002 of the Water Code to "recognize[] that a landowner owns the groundwater below the surface of the landowner's land as real property." Regarding groundwater regulation, section 36.002 continues:

---

[158] 642 S.W.2d 438 (Tex. 1982).

[159] *Tex. Water Rights Comm'n v. Wright*, 464 S.W.2d 642 (Tex. 1971).

[160] *Guadalupe*, 642 S.W.2d at 444 ("It is true that riparians, whose land grants were acquired before July 1, 1895, have a vested right in the use of the non-flood waters, but that vested right is to a usufructory use of what the state owns. A usufruct has been defined as the right to use, enjoy and receive the profits of property that belongs to another.").

[161] *Id.* at 445 (quoting *Wright*, 464 S.W.2d at 647).

(c)     Nothing in this code shall be construed as granting the authority to deprive or divest a landowner, including a landowner's lessees, heirs, or assigns, of the groundwater ownership and rights described by this section.

(d)     This section does not:

(1)     prohibit a district from limiting or prohibiting the drilling of a well by a landowner for failure or inability to comply with minimum well spacing or tract size requirements adopted by the district;

(2)     affect the ability of a district to regulate groundwater production as authorized under Section 36.113, 36.116, or 36.122 or otherwise under this chapter or a special law governing a district; or

(3)     require that a rule adopted by a district allocate to each landowner a proportionate share of available groundwater for production from the aquifer based on the number of acres owned by the landowner.

(e)     This section does not affect the ability to regulate groundwater in any manner authorized [for the Edwards Aquifer Authority, the Harris-Galveston Subsidence District, and the Fort Bend Subsidence District].

Subsections (c) and (e) appear to be in some tension. Under the EAAA, a landowner can be prohibited from producing groundwater except for domestic and livestock use. This regulation, according to subsection (e), is unaffected by the Legislature's recognition of groundwater ownership in subsection (a). But subsection (c) abjures all "authority to deprive or divest a landowner . . . of . . . groundwater ownership and rights". If prohibiting all groundwater use except for domestic and livestock purposes does not divest a landowner of groundwater ownership, then either the groundwater rights recognized by section 36.002 are extremely limited, or else by "deprive" and "divest" subsection (c) does not include a taking of property rights for which adequate compensation is constitutionally guaranteed. We think the latter is true. The EAAA itself states: "The legislature intends that just compensation be paid if implementation of this article causes a taking of private

44

property or the impairment of a contract in contravention of the Texas or federal constitution."[162] The requirement of compensation may make the regulatory scheme more expensive, but it does not affect the regulations themselves or their goals for groundwater production.

The Legislature has declared that "rules developed, adopted, and promulgated by a district in accordance with the provisions of [chapter 36]" comprise "the state's preferred method of groundwater management".[163] Chapter 36 allows districts to consider historical use in permitting groundwater production, but it does not limit consideration to such use.[164] Neither the Authority nor the State has suggested a reason why the EAAA must be more restrictive in permitting groundwater use than chapter 36, nor does the Act suggest any justification. But even if there were one, a landowner cannot be deprived of all beneficial use of the groundwater below his property merely because he did not use it during an historical period and supply is limited.

In sum, the three *Penn Central* factors do not support summary judgment for the Authority and the State. A full development of the record may demonstrate that EAAA regulation is too restrictive of Day's groundwater rights and without justification in the overall regulatory scheme. We therefore agree with the court of appeals that summary judgment against Day's takings claim must be reversed.

---

[162] EAAA § 1.07.

[163] TEX. WATER CODE § 36.0015.

[164] *See generally id.* § 36.116.

**D**

The Authority warns that if its groundwater regulation can result in a compensable taking, the consequences will be nothing short of disastrous. A great majority of landowners in its area, it contends, cannot show the historical use necessary for a permit, and therefore the potential number of takings claims is enormous. The Authority worries that the financial burden of such claims could make regulation impossible, or at least call into question the validity of existing permits. Regulatory takings litigation is especially burdensome, the Authority notes, because of the uncertainties in applying the law that increase the expense and risk of liability. And the uncertainties are worse with groundwater regulation, the Authority contends, because there is no sure basis for determining permit amounts other than historical use. Moreover, the Authority is concerned that takings litigation will disrupt the robust market that has developed in its permits and that buyers will be wary of paying for permits that may later be reduced.

It must be pointed out that the Authority has identified only three takings claims that have been filed in the more than fifteen years that it has been in operation. While the expense of such litigation cannot be denied, groundwater regulation need not result in takings liability. The Legislature's general approach to such regulation has been to require that all relevant factors be taken into account. The Legislature can discharge its responsibility under the Conservation Amendment without triggering the Takings Clause. But the Takings Clause ensures that the problems of a limited public resource — the water supply — are shared by the public, not foisted onto a few. We cannot know, of course, the extent to which the Authority's fears will yet materialize, but the burden of the Takings Clause on government is no reason to excuse its

46

applicability.

## V

We turn briefly to Day's other constitutional claims.

Day contends that he was denied procedural due process in the administrative proceedings before the State Office of Administrative Hearings ("SOAH"). First, he complains that he was not allowed to challenge the constitutionality of the EAAA. But as a rule, an agency lacks authority to decide such an issue,[165] and Day points to no exception for this case. Second, Day complains that his case should have been heard by the Authority's full board of directors rather than an administrative law judge. But the Legislature created SOAH "to serve as an independent forum for the conduct of adjudicative hearings" and "to separate the adjudicative function from the investigative, prosecutorial, and policymaking functions in the executive branch".[166] SOAH was authorized to hear Day's case,[167] and Day does not explain how a hearing in an independent forum violated his constitutional rights. Third, Day complains that an administrative law judge's statutory authority to "communicate ex parte with an agency employee who has not participated in a hearing in the case for the purpose of using the special skills or knowledge of the agency and its staff in evaluating the evidence"[168] violates constitutional guarantees of due process and open courts. The

---

[165] *Cent. Power & Light Co. v. Sharp*, 960 S.W.2d 617, 618 (Tex. 1997) (per curiam) ("Where, as here, the final agency order is challenged in the trial court on the ground that the underlying statute is unconstitutional, the agency lacks the authority to decide that issue.").

[166] TEX. GOV'T CODE § 2003.021(a).

[167] *Id.* § 2003.021(b)(4) ("[SOAH] may conduct . . . administrative hearings . . . in matters voluntarily referred to the office by a governmental entity.").

[168] *Id.* § 2001.061(c).

authority quoted is an exception to the general statutory rule prohibiting ex parte contacts.[169] We need not address Day's argument because he points to no ex parte contacts in this case.

Day argues that the substantial evidence rule deprives him of due process by restricting the evidence he can present on judicial review of the administrative decision. Day does not identify evidence he was prevented from presenting in the administrative proceeding that would have affected the Authority's decision. The substantial evidence rule does not operate to restrict Day's evidence on his takings claim.[170]

Day complains that the Authority acted arbitrarily by indicating its preliminary approval of a 600 acre-feet permit, granting his application for a replacement well, which he drilled at a cost of $95,000, then limiting his permit to 14 acre feet. But the Authority clearly communicated to Day that neither decision suggested what its final decision would be.

Finally, Day complains that section 36.066(g) of the Water Code,[171] which authorizes an award of attorney fees and expenses to a groundwater conservation district that prevails in a suit like this but not to an opposing party, violates equal protection. Day does not argue that the statute "'jeopardizes exercise of a fundamental right or categorizes on the basis of an inherently suspect

---

[169] *Id.* § 2001.061(a) ("Unless required for the disposition of an ex parte matter authorized by law, a member or employee of a state agency assigned to render a decision or to make findings of fact and conclusions of law in a contested case may not directly or indirectly communicate in connection with an issue of fact or law with a state agency, person, party, or a representative of those entities, except on notice and opportunity for each party to participate.").

[170] *See City of Dall. v. Stewart*, ___ S.W.3d ___, ___ (Tex. 2012).

[171] TEX. WATER CODE § 36.066(g) ("If the district prevails in any suit other than a suit in which it voluntarily intervenes, the district may seek and the court shall grant, in the same action, recovery for attorney's fees, costs for expert witnesses, and other costs incurred by the district before the court. The amount of the attorney's fees shall be fixed by the court.").

characteristic,'"[172] and thus "the law will be upheld as long as it is rationally related to a legitimate state interest."[173] We agree with the court of appeals that the State has a legitimate interest in "discourag[ing] suits against groundwater districts to protect them from costs and burdens associated with such suits", and a cost-shifting statute is rationally related to advancing that interest.[174]

Accordingly, we conclude that Day's various constitutional claims, other than his takings claim, are without merit.

<div align="center">*　　*　　*</div>

For these reasons, the judgment of the court of appeals is

<div align="right">*Affirmed*.</div>

<div style="margin-left:40%">

Nathan L. Hecht
Justice

</div>

Opinion delivered: February 24, 2012

---

[172] *First Am. Title Ins. Co. v. Combs*, 258 S.W.3d 627, 639 (Tex. 2008) (quoting *Nordlinger v. Hahn*, 505 U.S. 1, 10 (1992)).

[173] *Id.* at 639.

[174] *Edwards Aquifer Auth. v. Day*, 274 S.W.3d 755 (Tex. App.–San Antonio 2008).

<div align="center">49</div>