ACCEPTED
15-24-00052-CV
FIFTEENTH COURT OF APPEALS
AUSTIN, TEXAS
3/24/2025 12:00 AM
CHRISTOPHER A. PRINE
CLERK

No. 15-24-00052-CV

FILED IN
15th COURT OF APPEALS
AUSTIN, TEXAS
3/24/2025 12:00:00 AM
CHRISTOPHER A. PRINE
Clerk

IN THE FIFTEENTH DISTRICT COURT OF APPEALS (AUSTIN)

Richard M. YOUNG, Jr. a/k/a Richard Young,
*Appellant*
*vs.*

TEXAS PARKS & WILDLIFE DEPARTMENT, et al.,
*Appellees.*

## APPELLANT'S SUPPLEMENTAL AUTHORITIES

To the Honorable Justices:

Appellant points this Court to authority handed down on Friday, March 22, 2025, relating to the legal issues presented in this appeal. In *Commons of Lake Houston, Ltd. v. City of Houston,* the Supreme Court of Texas addressed an inverse condemnation claim and its ripeness. No. 23-0474, __ S.W.3d __ (Tex. 2025).

There, a developer of a master-planned community, the Commons, was impacted by newly-enacted Floodplain Ordinance by the City of Houston. Parts of the Commons are within the City's 100-year or 500-year floodplains. The new ordinance raised the required elevation for new

1

residential structures within the floodplains. The Commons sued the City for inverse condemnation and takings, and the City filed a plea to the jurisdiction, arguing that the claims were unripe because the City had not made a final decision on a permit or application. The Commons argued that the City unreasonably withheld a decision, so its claims were ripe under the futility doctrine.

The trial court denied the City's plea, but the court of appeals reversed, holding the claims were barred by governmental immunity because the because the new ordinance was a valid exercise of the City's police power and could not constitute a taking. The Supreme Court of Texas reversed, upholding the pleaded regulatory taking, and remanding to the trial court for further proceedings. The court discussed in detail the varied versions of recognized regulatory takings under the state and federal constitutions. The court also acknowledged:

> "Unlike the federal Constitution, the Texas Constitution expressly requires compensation for property that is "damaged" or "destroyed for or applied to a public use. Our constitution thus requires compensation "in more circumstances than the United States Constitution." . . . But as The Commons insists, we have also suggested that property may be "damaged" by a non-physical interference with its use and enjoyment, such as an unreasonable deprivation of access to the

2

property.

*Id.* at \*5 (addressing takings under *Lucas v. S.C. Coastal Council,* 505 U.S. 1003, 1019 (1992) and *Penn. Centr. Transp. Co. v. City of New York,* 438 U.S. 104, 124 (1978)).

The court went on to discuss precedent examining the meaning and scope of the constitutional term, "damaged." *Id.* at n.35. The court included within its Opinion the following quoted language from existing precedent:

- "[If] an injury, not suffered by the particular property or right only in common with other property or rights in the same community or section, by reason of the general fact that the public work exists, be inflicted, then such property may be said to be damaged."[1]

- "[W]e held in *DuPuy* that 'a direct physical invasion' is not required under section 17, article I, of the Texas Constitution by reason of the addition to the Constitution of 1876 of the words 'damaged or destroyed.'"[2]

- "[P]roperty has been damaged for a public use within the meaning

---

[1]*Steele v. City of Houston,* 603 S.W.2d 786, 790 (Tex. 1980) (emphasis added) (quoting *Gulf, Colo. & Santa Fe Ry. Co. v. Fuller,* 63 Tex. 467 (1885)).
[2]*City of Austin v. Teague,* 570 S.W.2d 389, 393 (Tex. 1978).

3

of the Constitution when access is materially and substantially impaired even though there has not been a deprivation of all reasonable access."[3]

- "It was the injustice of requiring an actual taking which explains the inclusion for the first time in the Constitution of 1876 of the requirement that compensation be paid for the damaging of property for public use."[4]

Young respectfully requests this Court include this precedent in its analysis of whether his live pleading, which include takings claims (and due process claims) based on the damage to Young's personal and real property, improvements, small business, and permit, presents a claim for which Appellees are not immune or if, in the alternative, Young should be afforded an opportunity to replead, especially in light of this relevant precedent recently handed down.

---

[3]*City of Waco v. Texland Corp.,* 446 S.W.2d 1, 2 (Tex. 1969).
[4]*DuPuy v. City of Waco,* 396 S.W.2d 103, 106 (Tex. 1965).

Respectfully submitted,

Kimberly S. Keller
KELLER STOLARCZYK PLLC
215 W. Bandera Road
No. 114-PMB 800
Boerne, Texas 78006
Tele: 830.981.5000
*Kimberly S. Keller*
Kimberly S. Keller
SBN: 24014182
Email: kim@kellsto.com

**APPELLANT'S COUNSEL**

**CERTIFICATE OF SERVICE**

On March 22, 2025, I certify Appellant's Supplemental Authorities

was served through this Court's e-filing server, on those listed below:

*Counsel for Appellees:*

KEN PAXTON, Attorney General of Texas; BRENT WEBSTER, First
Asst. Attorney General; JAMES LLOYD, Deputy Attorney General for
Civil Litigation; KELLIE E. BILLINGS-RAY, Chief, Environmental
Protection Division, OFFICE OF THE ATTORNEY GENERAL,
Environmental Protection Division, P.O. Box 12548, MC066, Austin,
Texas 78711-2548

IAN LANCASTER, Asst. Attorney General, Email:
ian.lancaster@oag.texas.gov

H. CARL MYERS, Asst. Attorney General, Email:
carl.myers@oag.texas.gov

HEATHER COFFEE, Asst. Attorney General, Email:
heather.coffee@oag.texas.gov

*Counsel for Texas Animal Health Commission:*

KAREN L. WATKINS, Asst. Attorney General, Administrative Law
Division, Office of the Attorney General, P.O. Box 12548, Austin, Texas
78711, Email: karen.watkins@oag.texas.gov

*Kimberly S. Keller*
Kimberly S. Keller

# Supreme Court of Texas

No. 23-0474

The Commons of Lake Houston, Ltd.,
*Petitioner*,

v.

City of Houston, Texas,
*Respondent*

On Petition for Review from the
Court of Appeals for the First District of Texas

**Argued October 31, 2024**

JUSTICE BOYD delivered the opinion of the Court.

After Hurricane Harvey struck Texas in 2017, the City of Houston amended its ordinances to increase the elevation requirements for construction in a floodplain. A developer sued the City for inverse condemnation, alleging that the amendments caused a regulatory taking of the developer's property under the Texas Constitution. The trial court denied the City's plea to the jurisdiction, but the court of appeals reversed and dismissed the case, holding the developer cannot establish a valid takings claim because the City amended the ordinance

as a valid exercise of its police power and to comply with a federal flood-insurance program. Although these facts are undisputed, we do not agree that they negate the possibility of a taking. Nor do we agree with the City that the developer's claims are unripe or that the developer lacks standing to assert them. We thus reverse the court of appeals' judgment and remand the case to the trial court for further proceedings.

## I.
## Background

The Commons of Lake Houston first began developing a 3,300-acre residential community near Lake Houston in 1993. Focusing on one phase at a time, it has subdivided, platted, and cleared the raw land in sections, adding streets and utilities and then selling empty lots to buyers and builders who design and construct the homes. This case involves a section called The Crossing, a 300-plus-acre area that includes many of the project's most valuable lots. The Commons's business plan relied on revenue from the earlier phases to finance the subsequent phases and ultimately produce profits from the last phases, including The Crossing. The Crossing's lakefront and lakeview lots are more valuable than most, but they also lie in areas colloquially referred to as the 100- and 500-year floodplains.[1]

---

[1] Like similar federal laws, the City's ordinances have referred to "base flood elevations" as areas having a 1-percent or 0.2-percent chance of flooding in any given year. *See* HOUS., TEX., CODE, Ordinance 85-1705, §§ 19-2 (defining base flood elevation as the flood elevation for "a flood having a one percent chance of being equalled [sic] or exceeded in any one year"), 19-33 (requiring new construction to be "elevated to or above the base flood elevation") (Sept. 25, 1985), *amended by* Ordinance 2018-258 (Apr. 4, 2018); *see also* Christine A. Klein, *The National Flood Insurance Program at Fifty: How the Fifth Amendment Takings Doctrine Skews Federal Flood Policy*, 31 GEO. ENV'T L. REV. 285, 296 (2019) [hereafter *NFIP at Fifty*] (explaining that federal law

Part of the overall project, including The Crossing, is within the City of Houston's city limits. Through the years, the City has generally supported the project, approving a municipal utility district, agreeing to provide utility services, approving a general plan[2] for each section, and granting The Commons various permits and waivers. In 2017, the City approved a general plan for 122.5 acres in The Crossing, which included plans for water, sanitary sewer, drainage, and streets for 531 lots. After obtaining the City's approval, The Commons proceeded to invest over $1 million in developing The Crossing.

Because The Crossing lies within the floodplain, however, the City code requires The Commons to obtain a floodplain-development permit or a variance from that requirement.[3] The City-approved general plan was based on the code's requirement that foundation slabs be constructed at an elevation at least one foot above the 100-year

---

"focuses on 'special flood hazard areas,' which are defined as places that have a one percent chance each year of flooding ('1%-chance floodplains')"). Like the parties (and many others), we will refer to the 1-percent-chance and 0.2-percent-chance floodplains as the 100-year and 500-year floodplains, without intending to support the misconception that these areas will flood only once every 100 or 500 years. *See* Klein, *NFIP at Fifty*, 31 GEO. ENV'T L. REV. at 303 ("Although colloquially referred to as the 'hundred-year floodplain,' these areas have a one percent chance of flooding *each* year, making it possible to have 'hundred year' floods in successive years."); *Flood Zones*, FEMA (July 8, 2020), https://www.fema.gov/about/glossary/flood-zones ("The 1-percent annual chance flood is also referred to as the base flood or 100-year flood.").

[2] A general plan is "a map illustrating the general design features and street layout of a proposed development of land that is to be subdivided and platted in sections." HOUS., TEX., CODE § 42-1 (2024).

[3] *See id.* §§ 19-16, 19-20.

3

floodplain.[4] In August 2017, however, Hurricane Harvey struck the Houston area, dumping over sixty inches of rain, breaking flood-damage records, and directly causing at least sixty-eight deaths.[5] In response, and anticipating that the Federal Emergency Management Agency (FEMA) would revise its maps to identify new "special flood hazard areas,"[6] the City amended its ordinances in April 2018. As amended, the City code now requires that foundation slabs be constructed at an elevation at least *two* feet above the *500*-year floodplain.[7]

The Commons asserts that the amendment increased the required slab elevations in The Crossing by an average of 5.5 feet and, as a result, rendered 557 of the 669 total lots (and over seventy-five percent of the total acreage) undevelopable. Because of the new elevation requirement, The Commons alleges it had to cancel development and sales contracts, lost $4.4 million in revenue and $1.8 million in bond reimbursements, and had to borrow over $1 million to cover cash flow. Ultimately, The Commons asserts, the amendment destroyed its expected profits from the entire 3,300-acre project.

---

[4] *Id.* § 19-2 (Sept. 25, 1985), *amended by* Hous., Tex., Ordinance 2018-258 (Apr. 4, 2018), https://library.municode.com/tx/houston/ordinances/code_of_ordinances?nodeId=891265.

[5] *See* Klein, *NFIP at Fifty*, 31 GEO. ENV'T L. REV. at 306–07.

[6] *See* Hous., Tex., Ordinance 2018-258 (Apr. 4, 2018).

[7] *See* HOUS., TEX., CODE §§ 19-2 (defining "minimum flood protection elevation" to mean "the 0.2 percent flood elevation, plus 2 feet"), 19-33 (requiring new construction to be "elevated to at least the minimum flood protection elevation"); *see also Flood Zones*, FEMA (July 8, 2020), https://www.fema.gov/about/glossary/flood-zones (defining the 0.2-percent-chance flood level as the 500-year floodplain).

4

The Commons filed this suit against the City in 2020,[8] asserting that the amended ordinance caused a regulatory taking for which the Texas Constitution requires reasonable compensation. The City filed a plea to the jurisdiction, arguing the claim was unripe because the City had not yet denied a permit and The Commons had not sought a variance. The City also argued that governmental immunity bars the suit because The Commons failed to allege a valid takings claim.

The trial court denied the City's jurisdictional plea, the City took an interlocutory appeal, and the court of appeals reversed. 698 S.W.3d 572, 588 (Tex. App.—Houston [1st Dist.] 2023). Without reaching or addressing the City's ripeness argument, the court of appeals held that The Commons failed to assert a valid takings claim because the City amended the ordinance as a valid exercise of its police power and to "track" the criteria of the federal National Flood Insurance Program. *Id.* at 585–86. We granted The Commons's petition for review.

## II.
### Texas Takings Claims

Governmental immunity protects the City against—and deprives the courts of jurisdiction over—this suit unless that immunity has been waived. *City of Houston v. Carlson*, 451 S.W.3d 828, 830 (Tex. 2014). The Texas takings clause—Article I, Section 17 of the Texas Constitution—waives the City's immunity and establishes the courts' jurisdiction, but

---

[8] As described further below, The Commons first filed suit in 2018, even before the amended ordinance's effective date. The City argued that the claim was not ripe, and the court of appeals agreed and dismissed that suit. *See City of Houston v. Commons at Lake Hous., Ltd.* (*Commons I*), 587 S.W.3d 494, 501–02 (Tex. App.—Houston [14th Dist.] 2019, no pet.).

only if The Commons has alleged a legally viable takings claim. *Id.*[9] We thus begin by considering what constitutes a viable Texas takings claim and then address the court of appeals' holding that The Commons's claim is not viable because the City amended its ordinances in the exercise of its police power and to comply with the National Flood Insurance Program.

## A. Texas takings law

Article I, Section 17 provides: "No person's property shall be taken, damaged, or destroyed for or applied to public use without adequate compensation being made, unless by the consent of such person . . . ." TEX. CONST. art. I, § 17. This provision of the Texas Bill of Rights reflects that the "right to own, use, and enjoy one's private property is a fundamental right," *City of Baytown v. Schrock*, 645 S.W.3d 174, 179 (Tex. 2022) (citing *Hearts Bluff Game Ranch, Inc. v. State*, 381 S.W.3d 468, 476 (Tex. 2012)), and "among our most cherished liberties," *Carlson*, 451 S.W.3d at 830. But the clause does not prohibit the government from taking, damaging, destroying, or applying private property; it instead requires that any such action be for a public use and that the government adequately compensate the owner for the property taken. *KMS Retail Rowlett, LP v. City of Rowlett*, 593 S.W.3d 175, 181

---

[9] *See Harris Cnty. Flood Control Dist. v. Kerr*, 499 S.W.3d 793, 799 (Tex. 2016) ("Sovereign immunity does not shield the government from liability for compensation under the takings clause."); *City of Dallas v. VSC, LLC*, 347 S.W.3d 231, 236 (Tex. 2011) (explaining that the Constitution "waives immunity for suits brought under the Takings Clause"); *Steele v. City of Houston*, 603 S.W.2d 786, 791 (Tex. 1980) ("The Constitution itself is the authorization for compensation for the destruction of property and is a waiver of governmental immunity for the taking, damaging or destruction of property for public use.").

(Tex. 2019).[10] The clause thus seeks to balance a citizen's private-property rights against the "inexorable" "demands of progress" and the need to encourage "public improvements" by requiring "all citizens [to share] equally in the cost of progress." *DuPuy v. City of Waco*, 396 S.W.2d 103, 106 (Tex. 1965).[11]

An owner who believes the government has taken its property may bring an "inverse" condemnation claim to recover adequate compensation. *Kopplow*, 399 S.W.3d at 536.[12] To prevail on an inverse-condemnation claim, the owner must plead and prove that (1) the government engaged in affirmative conduct[13] (2) that

---

[10] *See also Schrock*, 645 S.W.3d at 179 ("When the government takes, damages, or destroys private property for public use, it must provide compensation."); *Kopplow Dev., Inc. v. City of San Antonio*, 399 S.W.3d 532, 535 (Tex. 2013) ("The Texas Constitution resolves the tension between private property rights and the government's ability to take private property by requiring takings to be for public use, with the government paying the landowner just compensation."); *VSC*, 347 S.W.3d at 236 ("[I]t is not the taking of property, as such, that raises constitutional concerns, but the taking of property *without just compensation.*"); *Sheffield Dev. Co. v. City of Glenn Heights*, 140 S.W.3d 660, 669 (Tex. 2004) ("[T]he takings provisions of the state and federal constitutions do not limit the government's power to take private property for public use but instead require that a taking be compensated.").

[11] *See also Armstrong v. United States*, 364 U.S. 40, 49 (1960) (explaining that the federal Constitution's takings clause is "designed to bar Government from forcing some people alone to bear public burdens which, in all fairness and justice, should be borne by the public as a whole").

[12] Alternatively, the government may pursue a "statutory" condemnation claim to establish public use and the amount it must pay the owner before taking his property. *Kopplow*, 399 S.W.3d at 536.

[13] *See Kerr*, 499 S.W.3d at 799–800, 805.

7

proximately caused[14] (3) the taking, damaging, destroying, or applying[15] (4) of specific private property[16] (5) for a public use[17] (6) without paying the owner adequate compensation[18] (7) and did so intentionally or with knowledge that the result was substantially certain to occur.[19] Whether a compensable taking has occurred is a question of law for the courts to decide,[20] although a factfinder may need to resolve factual disputes before the court can decide the ultimate legal question.[21]

At this stage in this case, the parties dispute only the third element: whether the City's amendment to its floodplain ordinance caused a taking, damaging, destroying, or applying of The Commons's property. We have recognized two broad types of takings: (1) a *physical*

---

[14] *See Hearts Bluff*, 381 S.W.3d at 483–84; *City of Austin v. Travis Cnty. Landfill Co.*, 73 S.W.3d 234, 243 (Tex. 2002); *State v. Schmidt*, 867 S.W.2d 769, 777 (Tex. 1993).

[15] *See Kerr*, 499 S.W.3d at 799.

[16] *Id.* at 800.

[17] *See City of Dallas v. Jennings*, 142 S.W.3d 310, 313 (Tex. 2004); *Gen. Servs. Comm'n v. Little-Tex Insulation Co.*, 39 S.W.3d 591, 598 (Tex. 2001).

[18] *See Carlson*, 451 S.W.3d at 831.

[19] *See Tex. Dep't of Transp. v. Self*, 690 S.W.3d 12, 26 (Tex. 2024); *Schrock*, 645 S.W.3d at 178; *Kerr*, 499 S.W.3d at 799; *Carlson*, 451 S.W.3d at 831; *Kopplow*, 399 S.W.3d at 537–38; *Gragg*, 151 S.W.3d at 554; *Jennings*, 142 S.W.3d at 314; *Little-Tex*, 39 S.W.3d at 598–99.

[20] *See Kerr*, 499 S.W.3d at 806–07; *Hearts Bluff*, 381 S.W.3d at 477; *Edwards Aquifer Auth. v. Day*, 369 S.W.3d 814, 839 (Tex. 2012); *Travis Cnty. Landfill*, 73 S.W.3d at 241; *Little-Tex*, 39 S.W.3d at 598; *City of Waco v. Texland Corp.*, 446 S.W.2d 1, 2 (Tex. 1969); *DuPuy*, 396 S.W.2d at 110.

[21] *See City of Lorena v. BMTP Holdings, L.P.*, 409 S.W.3d 634, 645 (Tex. 2013); *Day*, 369 S.W.3d at 843.

occupation, appropriation, or invasion of property[22] and (2) a *regulatory* action that is so restrictive or intrusive "that it effectively 'takes' the property." *Jim Olive Photography v. Univ. of Hous. Sys.*, 624 S.W.3d 764, 771–72 (Tex. 2021) (citing *Murr v. Wisconsin*, 582 U.S. 383, 393 (2017)).[23] The Commons asserts only a regulatory taking, which we have agreed may result when the government denies a development permit. *Westgate, Ltd. v. State*, 843 S.W.2d 448, 452 (Tex. 1992).

Finding guidance in United States Supreme Court decisions construing the federal Constitution's takings clause,[24] we have recognized that a regulatory taking may occur when a law or ordinance (1) requires an owner to suffer a permanent physical loss or invasion of its property (sometimes called a *Loretto* taking),[25] (2) completely deprives an owner of all economically beneficial use of its property (sometimes called a *Lucas* taking),[26] or (3) unreasonably interferes with

---

[22] A physical taking "is, categorically, a taking for which compensation is constitutionally mandated." *Sheffield*, 140 S.W.3d at 669–70.

[23] *See Mayhew v. Town of Sunnyvale*, 964 S.W.2d 922, 933 (Tex. 1998) ("Takings can be classified as either physical or regulatory takings.").

[24] The Fifth Amendment to the United States Constitution, which the Fourteenth Amendment makes applicable to the states, provides simply, "nor shall private property be taken for public use, without just compensation." U.S. CONST., amend. V.

[25] *See Loretto v. Teleprompter Manhattan CATV Corp.*, 458 U.S. 419, 441 (1982) (holding that state law requiring landlords to permit cable companies to install cable facilities in apartment buildings caused a per se regulatory taking).

[26] *See Lucas v. S.C. Coastal Council*, 505 U.S. 1003, 1019, 1024 (1992) (holding that regulations that completely deprive an owner of all economically beneficial use of her property are "categorical" takings). A *Lucas* taking occurs in the "extraordinary circumstance" when a regulation permits "*no* productive or economically beneficial use of land," leaving the owner with no more than a

the owner's right to use and enjoy its property (often called a *Penn Central* taking).[27] *Day*, 369 S.W.3d at 838–39 (quoting *Lingle v. Chevron U.S.A. Inc.*, 544 U.S. 528, 540, 537 (2005)); *see Mayhew*, 964 S.W.2d at 935–36.[28] *Loretto* takings and *Lucas* takings constitute "per se" takings. *Sheffield*, 140 S.W.3d at 671.[29] Identifying a *Penn Central* taking, however, requires the court to engage in an "ad hoc" and "situation-specific" factual inquiry, weighing multiple factors including (1) the regulation's economic impact on the owner,[30] (2) the extent to which the

---

mere "token interest." *Sheffield*, 140 S.W.3d at 671; *see Mayhew*, 964 S.W.2d at 936 (explaining that a *Lucas* taking occurs when the regulatory action "totally destroy[s] the property's value").

[27] *See Penn Cent. Transp. Co. v. City of New York*, 438 U.S. 104, 124 (1978).

[28] Actually, we have also recognized a fourth type of regulatory taking, often referred to as a "land-use exaction" claim, *see Day*, 369 S.W.3d at 839, which may occur when the government conditions its approval of the use or development of private property on a particular payment or performance by the owner. *Town of Flower Mound v. Stafford Ests. Ltd. P'ship*, 135 S.W.3d 620, 634 (Tex. 2004). Generally, the government's act of demanding such an "exaction" from the owner constitutes a compensable taking unless "the condition (1) bears an essential nexus to the substantial advancement of some legitimate government interest and (2) is roughly proportional to the projected impact of the proposed development." *Id.*

[29] Acknowledging the proximate-cause element of an inverse-condemnation claim, the United States Supreme Court has held that a per se regulatory taking does not require compensation when "'background principles of nuisance and property law' independently restrict the owner's intended use of the property." *Lingle*, 544 U.S. at 540 (quoting *Lucas*, 505 U.S. at 1026–32).

[30] This first factor measures the "magnitude" of the economic effect on the owner's property. *Penn Cent.*, 438 U.S. at 136. We have said that it "merely compares the value that has been taken from the property with the value that remains in the property." *Mayhew*, 964 S.W.2d at 935–36. It requires consideration of the extent to which the regulation reduces the property's value

regulation interferes with the owner's reasonable investment-backed expectations,[31] and (3) the character of the government action.[32] *Penn Cent.*, 438 U.S. at 130–31.[33] The Commons alleges in this case that the City's ordinance amendment either completely deprived it of all economically beneficial use of its property (a *Lucas* taking) or unreasonably interfered with its right to use and enjoy its property (a *Penn Central* taking).

---

but also of the remaining value as compared to what the owner initially invested in the property. *Sheffield*, 140 S.W.3d at 677. It thus may involve consideration of the owner's investment profits or losses. *Id.*

[31] This second factor requires consideration of more than just what the owner may have subjectively "believed was available for development." *Penn Cent.*, 438 U.S. at 130. It requires consideration of the owner's "primary expectation concerning the use of the parcel," *id.* at 136, and whether that expectation was "reasonable" or merely "speculative," *Sheffield*, 140 S.W.3d at 677–78. It also requires consideration of the "existing and permitted uses of the property" prior to the regulation, *Mayhew*, 964 S.W.2d at 936; *see Sheffield*, 140 S.W.3d at 677, and whether the regulation permits the owner to obtain a "reasonable" return on its investment, *Mayhew*, 964 S.W.2d at 936.

[32] This third factor requires consideration of issues like whether (and the extent to which) the regulation is specific to the plaintiff's property or is "general in character," *Sheffield*, 140 S.W.3d at 678, is designed to "take unfair advantage" of the owner, *id.*, or permits the owner to avoid the harm through an appellate process or payment, *Schrock*, 645 S.W.3d at 181. That the regulation "has a more severe impact on some landowners than on others," however, "in itself does not mean that the law effects a 'taking.'" *Penn Cent.*, 438 U.S. at 133.

[33] *See also Jim Olive Photography*, 624 S.W.3d at 772; *BMTP Holdings*, 409 S.W.3d at 644; *Hearts Bluff*, 381 S.W.3d at 477–78; *Sheffield*, 140 S.W.3d at 672. This analysis requires more than a "merely mathematical" process. *Sheffield*, 140 S.W.3d at 677. No one factor "is determinative," and the court must consider all the factors together "as well as any other relevant considerations." *Day*, 369 S.W.3d at 840.

Unlike the federal Constitution, the Texas Constitution expressly requires compensation for property that is "damaged" or "destroyed for or applied to a public use." TEX. CONST. art. I, § 17. Our Constitution thus requires compensation "in more circumstances than the United States Constitution." *Schrock*, 645 S.W.3d at 179.[34] As the City insists, we have referred to the "damaged" provision as applying when the government "*physically* damages private property." *Jennings*, 142 S.W.3d at 314 (emphasis added). But as The Commons insists, we have also suggested that property may be "damaged" by a non-physical interference with its use and enjoyment, such as an unreasonable deprivation of access to the property. *See DuPuy*, 396 S.W.2d at 108

---

[34] *See Self*, 690 S.W.3d at 25 ("Our Takings Clause protects against more types of government action than its federal counterpart, as it contains the additional verbs 'damaged,' 'destroyed,' and 'applied'—each of which creates a claim with its own distinct scope." (internal citation omitted)). We have not fully explored the differences between the two clauses because litigants have routinely treated the two as if they were the same. *See, e.g.*, *Stafford Ests.*, 135 S.W.3d at 631 ("[S]ince neither party makes that argument here, we assume that the application of both provisions is identical in these circumstances."). As a result, up to this point, our "case law on takings under the Texas Constitution is," at least for the most part, "consistent with federal jurisprudence." *Hearts Bluff*, 381 S.W.3d at 477. Yet we have observed that although the "taking, the damaging, or the destruction of property are often treated, more or less, as synonyms," these terms "are different and have different historical origins." *Steele*, 603 S.W.2d at 789. Property is "taken," we've explained, when it is "transferred from one owner to another," but the "government's duty to compensate for *damaging* property for public use [is] not dependent upon the transfer of property rights." *Id.* at 790. After oral argument in this case, the City filed a post-submission letter brief with further arguments on this point and others. The Commons moved to strike the brief. We hereby deny the motion.

("[D]iminishment in the value of property resulting from a loss of access constitutes *damage*." (emphasis added)).[35]

At this stage of this case, however, we need not conduct a *Penn Central*-takings analysis or consider how the Texas Constitution's "damaged" provision affects that analysis because the City has never raised, and neither the trial court nor the court of appeals have addressed, those issues. In the trial court and on appeal, the City argued only that The Commons failed to allege a valid takings claims because, as a matter of law, a regulation can never cause a compensable taking if it (1) results from a valid exercise of the government's police power or, more specifically, (2) is designed to ensure compliance with the criteria required for participation in the National Flood Insurance Program. The trial court rejected these arguments, but the court of appeals agreed with both. 698 S.W.3d at 583, 587. We agree with the trial court.

---

[35] *See also Steele*, 603 S.W.2d at 790 ("[If] an injury, not suffered by the particular property or right only in common with other property or rights in the same community or section, by reason of the general fact that the public work exists, be inflicted, then such property may be said to be *damaged*." (emphasis added) (quoting *Gulf, Colo. & Santa Fe Ry. Co. v. Fuller*, 63 Tex. 467 (1885))); *City of Austin v. Teague*, 570 S.W.2d 389, 393 (Tex. 1978) (stating that we held in *DuPuy* that "'a direct physical invasion' is not required under section 17, article I, of the Texas Constitution by reason of the addition to the Constitution of 1876 of the words 'damaged or destroyed'"); *Texland*, 446 S.W.2d at 2 ("[P]roperty has been damaged for a public use within the meaning of the Constitution when access is materially and substantially impaired even though there has not been a deprivation of all reasonable access."); *DuPuy*, 396 S.W.2d at 108 ("It was the injustice of requiring an actual taking which explains the inclusion for the first time in the Constitution of 1876 of the requirement that compensation be paid for the damaging of property for public use.").

## B. Police power

The City argues, and the court of appeals agreed, that The Commons cannot establish a taking because the City amended the ordinance "to promote the public health, safety and general welfare and to minimize public and private losses due to flood conditions in specific areas." *Id.* at 587 (quoting HOUS., TEX., CODE § 19-1(a)). In the court's view, the amendment constitutes "a valid exercise of the city's police power" and thus "does not constitute a taking." *Id.* at 588 (quoting *City of College Station v. Turtle Rock Corp.*, 680 S.W.2d 802, 805 (Tex. 1984)). We have rejected the proposition, however, that a valid exercise of the police power can *never* cause a taking.

As we have often explained, all privately owned property "is held subject to the valid exercise of the police power." *Turtle Rock*, 680 S.W.2d at 804 (citing *Lombardo v. City of Dallas*, 73 S.W.2d 475, 478 (Tex. 1934)).[36] The government must exercise its police power to "satisfy its responsibilities," and this commonly requires the imposition of restrictions on the use of private property. *Carlson*, 451 S.W.3d at 831. "Governments interfere with private property rights every day. Some of those intrusions are compensable; most are not." *Jim Olive Photography*, 624 S.W.3d at 771. Typically, when the government exercises its police power to, for example, abate a public nuisance or implement and enforce common zoning laws, no compensable taking occurs even though property owners lose some control over their

---

[36] *See also City of Dallas v. Stewart*, 361 S.W.3d 562, 569 (Tex. 2012); *Sheffield*, 140 S.W.3d at 670.

property rights. *Id.*[37] And this is true even when the government amends a regulation to impose a new restriction that previously did not exist. *Quick v. City of Austin*, 7 S.W.3d 109, 124–25 (Tex. 1998).

But we have long rejected "the notion that the government's duty to pay for taking property rights is excused by labeling the taking as an exercise of police powers." *Steele*, 603 S.W.2d at 789.[38] Indeed, whether a regulation constitutes a valid exercise of the police power—or promotes any other important public policy, purpose, or interest—is simply irrelevant to whether the regulation causes a compensable taking. *Lingle*, 544 U.S. at 543.[39] If a regulation does not promote a valid public purpose, the taking is simply impermissible because it is not a taking for a "public use," and "[n]o amount of compensation can

---

[37] *See Self*, 690 S.W.3d at 27; *Stewart*, 361 S.W.3d at 569; *Mayhew*, 964 S.W.2d at 938; *Ellis v. City of West University Place*, 175 S.W.2d 396, 398 (Tex. 1943); *Lombardo*, 73 S.W.2d at 478–81, 486.

[38] *See also Teague*, 570 S.W.2d at 391 (explaining that we have repeatedly held "that one's property may not be taken without compensation under some circumstances even in the exercise of the police power").

[39] *See Lucas*, 505 U.S. at 1028 (explaining that both a physical taking and a regulatory taking may occur "no matter how weighty the asserted 'public interests' involved"); *Penn Cent,*, 438 U.S. at 127 ("[A] state statute that substantially furthers important public policies may so frustrate distinct investment-backed expectations as to amount to a 'taking.'"). As a rare exception to this rule, however, we have suggested that a compensable taking may not occur when the government takes action to address a matter of "great public necessity," such as a fire or "war, riot, pestilence or other great public calamity," because of which the property is "destined to destruction anyway." *Steele*, 603 S.W.2d at 792; *see Baker v. City of McKinney*, 84 F.4th 378, 385 (5th Cir. 2023) (holding that "history, tradition, and historical precedent reaching back to the Founding supports the existence of a necessity exception to the Takings Clause"), *cert. denied*, No. 23-1363, 2024 WL 4874818 (U.S. Nov. 25, 2024). As no one contends that the City amended its ordinance to respond to such a public necessity, we need not explore that concept in this case.

15

authorize such action." *Id.*[40] So whether a regulation constitutes a valid exercise of the police power "is a separate question" than whether it results in a compensable taking. *Loretto*, 458 U.S. at 425. We do not even attempt to "compartmentalize" a government regulation as being *either* a taking *or* an exercise of the police power because of "the manifest illusoriness of the distinctions" between the two. *DuPuy*, 396 S.W.2d at 107.[41] Simply put, any attempt to create a dichotomy between takings and police-power regulations "has not proved helpful in determining when private citizens affected by governmental actions must be compensated." *Steele*, 603 S.W.2d at 789 (citing *Teague*, 570 S.W.2d at 389; *DuPuy*, 396 S.W.2d at 103; *San Antonio River Auth. v. Lewis*, 363 S.W.2d 444 (Tex. 1963); *Brazos River Auth. v. City of Graham*, 354 S.W.2d 99 (Tex. 1962)).

---

[40] *See Haw. Hous. Auth. v. Midkiff*, 467 U.S. 229, 240 (1984) ("The 'public use' requirement is thus coterminous with the scope of a sovereign's police powers.").

[41] As we explained more than forty-five years ago:

The labels are not helpful. These two doctrines police power and eminent domain merge at so many places when applied to specific problems, that the legal battlefields have been variously termed a "sophistic Miltonian Serbonian Bog," *Brazos River Authority v. City of Graham*, 354 S.W.2d 99, 105 (Tex. 1962); a "crazy-quilt pattern," *San Antonio River Authority v. Garrett Brothers*, 528 S.W.2d 266, 273 (Tex. Civ. App.—San Antonio 1975, writ ref'd n.r.e.); "the manifest illusoriness of distinctions," *DuPuy*, 396 S.W.2d at 107; producing decisions that are "conflicting, and often . . . irreconcilable in principle." *Sauer v. City of New York*, 206 U.S. 536, 548 (1906).

*Teague*, 570 S.W.2d at 391.

The court of appeals relied in this case, however, on our statement in *Turtle Rock* that "[a] city is not required to make compensation for losses occasioned by the proper and reasonable exercise of its police power." 698 S.W.3d at 586 (quoting *Turtle Rock*, 680 S.W.2d at 804). The key to that statement, however, are the words "proper" and "reasonable." If the government exercises its police power to limit private-property rights in a way that causes no "*unreasonable* interference" under *Penn Central*, then no compensable taking occurs. But as we stated in the very next sentence in *Turtle Rock*, we have "refused to establish a bright line for distinguishing between an exercise of the police power which does constitute a taking and one which does not. Instead, the cases demonstrate that a careful analysis of the facts is necessary in each case of this kind." *Turtle Rock*, 680 S.W.2d at 804 (citing *Teague*, 570 S.W.2d at 391; *DuPuy*, 396 S.W.2d at 107). A city's exercise of its police power may be legally valid and proper and yet cause a taking if it causes a permanent physical invasion of private property (a *Loretto* taking), completely deprives an owner of all economically beneficial use of its property (a *Lucas* taking), or unreasonably interferes with the owner's right to use and enjoy its property (a *Penn Central* taking).

*Turtle Rock* involved the fourth type of regulatory taking, a land-use-exaction claim[42] challenging a city ordinance that required developers to either dedicate a portion of their land as park land or pay the city money as a condition to the city's approval of a subdivision plat.

---

[42] *See supra* note 28.

17

*Id.* at 803. The trial court and court of appeals held that the requirement caused a compensable taking as a matter of law, but we reversed, holding that the exaction requirement did not constitute a taking if it was substantially related to the people's general welfare *and was reasonable and not arbitrary. Id.* at 805. We held that the ordinance was not "unconstitutionally arbitrary or unreasonable on its face," but we remanded the case for the trial court to consider whether, under those facts, the ordinance was "unduly harsh" or created "a disproportionate burden" on the developer. *Id.* at 806.[43] *Turtle Rock* does not support the court of appeals' holding in this case, and our prior decisions have repeatedly and consistently rejected it. We reaffirm today that a regulation *can* cause a compensable Texas taking even if it results from a valid exercise of the government's police power.

## C. Flood-control regulations

The court of appeals found it particularly relevant, however, that the City amended its floodplain ordinance for the specific and express purpose of ensuring that its residents can obtain property insurance through the federal National Flood Insurance Program (NFIP).[44]

---

[43] As explained above, *see supra* note 28, we subsequently adopted the United States Supreme Court's "refinement" of this test for land-use-exaction cases, holding that an exaction constitutes a compensable taking unless the exaction "(1) bears an essential nexus to the substantial advancement of some legitimate government interest and (2) is roughly proportional to the projected impact of the proposed development." *Stafford Ests.*, 135 S.W.3d at 634.

[44] *See* 42 U.S.C. § 4011(a) ("[T]he Administrator of the Federal Emergency Management Agency is authorized to establish and carry out a national flood insurance program which will enable interested persons to purchase insurance against loss resulting from physical damage to or loss of real property or personal property related thereto arising from any flood occurring in the United States."). Presumably, at least, Congress created the

Relying primarily on the Fifth Circuit's decision in *Adolph v. Federal Emergency Management Agency*, 854 F.2d 732 (5th Cir. 1988), the court held that the amended ordinance could not have caused a taking because, as a matter of law, "requiring compliance with local laws consistent with FEMA/NFIP requirements does not constitute a taking." 698 S.W.3d at 583. Again, we disagree.

*Adolph* was a class-action lawsuit against both FEMA and a Louisiana parish in which property owners complained that the parish's adoption of local regulations requiring compliance with FEMA's criteria for participation in the NFIP caused a taking by rendering their property unmarketable. 854 F.2d at 733–34. The trial court dismissed the claims against *FEMA*, and the Fifth Circuit affirmed. It first concluded that *FEMA* could not be liable for a taking because "the NFIP represents a voluntary federal program" with which the parish was not required to comply unless it wanted to make federally subsidized insurance available to its residents under the NFIP. *Id.* at 735–36. Because "the parish was not compelled to participate in the NFIP," the court held, "*FEMA* could not be charged with an unconstitutional taking of property, even if, *arguendo*, the elevation requirements otherwise could be shown to constitute an actual deprivation without

NFIP in 1968 to ensure adequate insurance coverage for properties subject to damaging floods, require owners of such properties (rather than the public at large) to bear the expense of such damage, minimize federal costs of responding to flood disasters, and ultimately discourage development in flood-prone areas. *See* Klein, *NFIP at Fifty*, 31 GEO. ENV'T L. REV. at 288–90, 295, 314. The NFIP makes federally subsidized insurance available to property owners but only if local regulations prohibit development within the 100-year floodplain. *See id.* at 296, 300–03.

compensation." *Id.* at 736 (emphasis added). Based on this reasoning, the Fifth Circuit concluded that "the NFIP, when operating precisely as intended by Congress, results in no unconstitutional taking of plaintiffs' property, regardless of state law." *Id.* at 737 (citing *Tex. Landowners Rights Ass'n v. Harris*, 453 F. Supp. 1025, 1032–33 (D.D.C. 1978), *aff'd*, 598 F.2d 311 (D.C. Cir. 1979)).

The Fifth Circuit went on to observe in *Adolph* that the "plaintiffs' chance of prevailing on the merits here is not increased by having joined the parish as a party-defendant, because even when the local government is sued directly, the same rejection of the takings claim obtains." *Id.* at 738. The court of appeals in this case relied on this statement to support its conclusion that *Adolph* stands for the proposition that any takings claim complaining of a local ordinance adopted to comply with the NFIP's requirements must fail as a matter of law. 698 S.W.3d at 586. But that's not what the Fifth Circuit held in *Adolph*. The Fifth Circuit discussed several decisions in which courts found that local ordinances adopted for participation in the NFIP did not cause an unconstitutional taking, but the courts in those cases concluded that the plaintiffs had failed to establish a taking under *Loretto*, *Lucas*, or *Penn Central*,[45] not that they could never establish

---

[45] The Fifth Circuit relied heavily in *Adolph* on the decision in *Texas Landowners*, but even in that case the district court found it relevant that "plaintiffs do not allege that their land has become useless" or "valueless" (and thus did not support a *Lucas* taking) and concluded that "this case turns upon the usual balancing test of social policy and public interest versus the rights of a landowner to be unencumbered in the use of his property." *Tex. Landowners*, 453 F. Supp. at 1032. These and other cases demonstrate that proving a flood-control regulation has caused a regulatory taking can be quite difficult, either because the regulation (1) does not compel the owner to endure a physical

20

such a taking as a matter of law. *Adolph*, 854 F.2d at 738–40. The Fifth Circuit thus concluded in *Adolph* that a local regulation that "tracks the

invasion of its property under *Loretto*, *see Maple Leaf Invs., Inc. v. Dep't of Ecology*, 565 P.2d 1162, 1165 (Wash. 1977) ("There is no physical invasion of appellant's property."); (2) does not deprive the owner of *all* beneficial use of its property under *Lucas*, *see Pope v. City of Atlanta*, 249 S.E.2d 16, 21 (Ga. 1978) (holding plaintiff could not establish a taking because flood-control measures "only regulate her use of her property and do not deprive her of all her rights in the property"); *Maple Leaf*, 565 P.2d at 1166 (noting no evidence that regulations "prohibit the appellant from making a profitable use of its property"); *Dur-Bar Realty Co. v. City of Utica*, 394 N.Y.S.2d 913, 918 (App. Div. 1977) (noting that flood-control regulations did not "destroy the economic utility of the subject parcel"), *aff'd*, 380 N.E.2d 328 (N.Y. 1978); *Grenier v. Zoning Bd. of Appeals of Chatham*, 814 N.E.2d 1154, 1160–61 (Mass. App. Ct. 2004) (noting restrictions did not deprive owner of "all economically beneficial use" of her lot, which retained "a residual value of $23,000," even though it deprived her "of the most profitable use"), *aff'd sub nom. Gove v. Zoning Bd. of Appeals of Chatham*, 831 N.E.2d 865 (Mass. 2005); *Turner v. County of Del Norte*, 24 Cal. App. 3d 311, 315 (Ct. App. 1972) (noting that owners "may use their lands in a number of ways which may be of economic benefit to them"); (3) does not unreasonably interfere with the owner's use and enjoyment of its property under *Penn Central*, *see Responsible Citizens in Opposition to Flood Plain Ordinance v. City of Asheville*, 302 S.E.2d 204, 210–11 (N.C. 1983) (concluding no taking under *Penn Central* because "each plaintiff . . . continues to have a 'practical' use for his property of 'reasonable value,'" even "assuming that the cost of complying with the land-use regulations is prohibitive . . . and recognizing that the market value of plaintiffs' properties has diminished" (quoting *Helms v. City of Charlotte*, 122 S.E.2d 817 (N.C. 1961))); or (4) does not proximately cause the owner's injury, *see Maple Leaf*, 565 P.2d at 1166 (observing it was "[n]ature," and "not the State," that "placed appellant's property in the path of floods," such that even without the challenged regulation "the property would still be subject to physical realities"); *Turner*, 24 Cal. App. 3d at 314 (noting evidence "of a frequency of flooding which would almost certainly eventually destroy any permanent residences built on this land," thus establishing that the zoning ordinance at issue imposed "no restrictions more stringent than the existing danger demands"). But they do not support the court of appeals' conclusion that landowners can never prevail on their claim if the challenged flood-control measure is adopted to comply with the NFIP.

21

criteria of the NFIP does not, *on its face*, effect a taking in violation of the fifth and fourteenth amendments" but the "validity under state law of the actual *application* of this ordinance to a particular piece of property depends upon the facts involved in each case." *Id.* at 740 (emphases added).

Here, The Commons contends that the amended floodplain ordinance effects a taking *as applied* to the lots in The Crossing, not that it effects a taking *on its face*. Whether it can prevail on that claim depends on whether it can support its allegations that the ordinance deprives it of all economic benefit under *Lucas* or unreasonably interferes with its use and enjoyment of the property (or causes "damage") under *Penn Central*,[46] not on whether the ordinance was designed to comply with the NFIP's criteria.[47] We do not in any way

---

[46] The Fifth Circuit noted in *Adolph* that if it were to consider the alternative ground FEMA proposed for its dismissal—that the loss of a property's best or most-valuable use does not rise to the level of a taking—the court would consider, among other things, the *Penn Central* factors to determine if a taking had occurred. 854 F.2d at 739 n.11 (citing *Kaiser Aetna v. United States*, 444 U.S. 164, 174–75 (1979) (reciting the *Penn Central* factors)). Although the court did not consider this alternative ground, it likewise did not dismiss it as unviable.

[47] The Commons argues that, even if *Adolph* stands for the proposition that a local ordinance that "tracks" the NFIP's requirements can never cause a compensable taking, *Adolph* does not apply here because the City's amended ordinance is *more* restrictive than the NFIP. As mentioned, the City amended its ordinance to require slabs at elevations at least two feet above the 500-year floodplain because it *anticipated* that FEMA would revise the NFIP criteria to impose that requirement. *See* 698 S.W.3d at 585 (noting that the 2018 ordinance states that it was adopted "to comply with NFIP/FEMA standards and *in anticipation* of new FEMA floodplain maps generated in response to Hurricane Harvey" (emphasis added)). As the court of appeals observed, the amended ordinance "states on its face that it was designed to be consistent with FEMA/NFIP criteria to allow Houston residents to obtain flood insurance,

22

prejudge the merits of those issues today, as neither the trial court nor the court of appeals has addressed them. We hold only that a regulatory taking can occur even when the regulation at issue is intended to promote compliance with the federal flood-insurance program.

## III.
### Ripeness and Standing

In addition to arguing that The Commons has not asserted a valid takings claim, the City argued in the trial court and in the court of appeals that the claim is not ripe. The court of appeals did not reach that issue,[48] but the City raises it in this Court as an alternative ground for affirming the court's judgment. In addition, the City argues for the first time in this Court that The Commons lacks standing to pursue its claim. We disagree on both counts.

### A. Ripeness

Ripeness is an element of subject-matter jurisdiction that presents a question of law we review de novo. *Mayhew*, 964 S.W.2d at 928. "In order for a regulatory takings claim to be ripe, there must be a final decision regarding the application of the regulations to the

---

and to protect the public health, safety, and welfare from the dangers of flooding." *Id.* at 584. But FEMA never made the anticipated revisions, so the City's amended ordinance imposes *greater* restrictions than the NFIP imposes. Because we conclude that an ordinance *can* cause a compensable taking even if it exactly tracks the NFIP's requirements, we need not address this argument.

[48] *Id.* at 588 n.11 ("In light of our disposition, we do not reach the City's second issue asserting that The Commons' takings claim is not ripe for adjudication.").

23

property at issue." *Id.* at 929.[49] A claim is not ripe without a "final and authoritative determination" because a court "cannot determine whether a regulation has gone 'too far' unless it knows how far the regulation goes." *Id.* (quoting *MacDonald, Sommer & Frates v. Yolo County*, 477 U.S. 340, 348 (1986)).

To obtain a final determination, the property owner generally must submit at least one application for the permitted use and seek a variance if the application is denied. *Id.*[50] But the "finality requirement is relatively modest," *Pakdel v. City & County of San Francisco*, 594 U.S. 474, 478 (2021), and "futile variance requests or re-applications are not required," *Mayhew*, 964 S.W.2d at 929. A subsequent application or variance request is "futile" when the government has made it clear that the owner cannot obtain approval for its desired use, that its request for a permit has been "definitively rejected," or that any subsequent request would make "no difference." *Herrington v. County of Sonoma*, 857 F.2d 567, 569–70 (9th Cir. 1988). The government may demonstrate such finality through its interactions and communications with the owner, *see Mayhew*, 964 S.W.2d at 931–32, or even through its briefs and arguments in the appellate court, *Palazzolo*, 533 U.S. at 621. Only "de

---

[49] A "final decision" applying the regulation to specific property is not required if the plaintiff "brings a facial challenge to the ordinance." *Mayhew*, 964 S.W.2d at 930.

[50] *See Palazzolo v. Rhode Island*, 533 U.S. 606, 620–21 (2001) ("As a general rule, until these ordinary processes have been followed the extent of the restriction on property is not known and a regulatory taking has not yet been established."). The requirement that the owner seek a "variance" or other form of waiver simply ensures that the government receives an opportunity to provide some form of relief to prevent a compensable taking. *Mayhew*, 964 S.W.2d at 930.

facto" finality is required, demonstrating that the government has "committed to a position." *Pakdel*, 594 U.S. at 479.

In this case, The Commons first filed suit against the City in 2018, even before the amended ordinance became effective. The City filed a plea to the jurisdiction, arguing that the claim was not ripe because The Commons had not yet sought or been denied a floodplain-development permit or a variance. *See Commons I*, 587 S.W.3d at 501. The trial court denied the City's plea, but the City took an interlocutory appeal, and the court of appeals reversed, dismissing The Commons's claims as unripe. *Id.* at 502.

The Commons then made a series of attempts to obtain a floodplain-development permit. In November 2019, it submitted a document requesting approval for slab elevations at the former level, one foot above the 100-year floodplain. The City never responded to that application. The City then told The Commons that the City's permit process required building-specific plans and that there was no process by which The Commons could obtain a general floodplain development permit for the entire development. The Commons attempted to apply for a site-wide permit anyway. It filed its application in February 2020, again seeking a "blanket finished floor elevation [one foot] above FEMA current [base flood elevation]." The City rejected the application because it lacked "a complete set of plans for a specific building."[51] The Commons

---

[51] The City points out that the application was also rejected for not including a "mitigation plan." But even taking this into account, nothing indicates that the City would have accepted the application if it had a mitigation plan but still lacked structural plans. Nor is there any evidence that, in the year that The Commons attempted to file a compliant application,

25

made a second attempt the next month, submitting documents showing proposed finished floor elevations for each lot, and it was again rejected for not having plans for specific structures. The Commons made repeated attempts to discuss the problem with the City from April 21, 2020, until August 3, 2020, but never received any further guidance.

Finally, in late 2020, The Commons submitted an amended general plan for The Crossing that it believed would comply with the City's amended floodplain ordinance. Under this plan, The Commons would develop only 76.5 of the original 122.5 acres, would sell less than half of the original number of lots, and would not sell any of the most-valuable lakefront lots at all, essentially depriving The Commons of the project's anticipated profits. The City approved the amended general plan but still declined to act on any permit application that did not detail proposed structures and elevations on the lots.

The Commons filed this (its second) suit in November 2020. The City finally responded to The Commons in March 2021, well over a year after The Commons first sought permit approval. Even then, the City told The Commons that an application must include "a site plan that depicted the lot, the proposed location of the structure relative to the lot lines, and the footprint of the structure, as well as building elevations indicating the foundation type, elevation of the finished grade adjacent to the structure, and the required minimum flood protection elevation." And the City argues, for the first time after two lawsuits spanning over six years, that The Commons will never be able to obtain a floodplain-

---

the City suggested to The Commons that the application would have been accepted with any other documents except structural plans.

development permit because it, as a developer, "has no right to obtain the permit." Tellingly, the City argues in this Court that The Commons's regulatory-takings claim "is not ripe on any questions presented *and cannot ever ripen.*"

Perhaps if the City had ever told The Commons that it was requesting the wrong permit or applying in the wrong manner, the City could have an argument that it was never given the opportunity to grant or deny The Commons relief. *See Mayhew*, 964 S.W.2d at 929. What the City has instead is a paper trail down which it dragged The Commons for months, if not years, with no suggestion of compromise or a final determination. *See Palazzolo*, 533 U.S. at 620 ("[A] landowner may not establish a taking before a land-use authority has the opportunity, using its own reasonable procedures, to decide *and explain* the reach of a challenged regulation." (emphasis added)). Nevertheless, the City's assertions that The Commons simply has "no right" to obtain a floodplain-development permit and that its claim "cannot ever ripen" clearly indicates absolute finality. Although the City has not yet formally denied a permit, it "may not burden property by imposition of repetitive or unfair land-use procedures in order to avoid a final decision." *Id.* Under these facts, we conclude that The Commons's inverse-condemnation claim is ripe for adjudication.[52]

---

[52] The City also argues, for the first time in this Court, that the two-year statute of limitations bars The Commons's claim. *See* TEX. CIV. PRAC. & REM. CODE § 16.003(a). Even if the City has not waived this defense (as The Commons contends), the claim could not have ripened and accrued until sometime after the court of appeals held that the first suit was not ripe in 2019, less than two years before The Commons filed this suit in November 2020.

## B. Standing

The City argues for the first time in this Court that The Commons lacks standing to pursue its claim.[53] Specifically, the City contends that The Commons lacks standing because it possessed only a mere expectancy, and not a vested interest, in the right to develop its property under the old elevation requirements and because its claims are not redressable by the courts. We disagree.

Generally, a "vested" right requires "something more than a mere expectancy based upon an anticipated continuance of an existing law." *Honors Acad., Inc. v. Tex. Educ. Agency*, 555 S.W.3d 54, 61 (Tex. 2018). But The Commons is not suing the City to enforce a right to develop its property under the old ordinance. Instead, it is suing for damages in the form of the compensation the Texas takings clause requires the City to pay if, in fact, the amended ordinance has taken, damaged, or destroyed the property for a public use. To have standing to recover for a Texas taking, The Commons need only establish that it has a vested "ownership interest in the property taken." *Tex. Dep't of Transp. v. City of Sunset Valley*, 146 S.W.3d 637, 644 (Tex. 2004).

Similarly, the City contends that The Commons lacks standing to challenge the amended ordinance because The Commons does not build homes on its lots and thus has no legal interest in an ordinance that restricts where homes can be built. But again, The Commons is suing the City to recover compensation for the damages it contends the

---

[53] As a component of subject-matter jurisdiction, issues of standing may be raised for the first time on appeal. *Meyers v. JDC/Firethorne, Ltd.*, 548 S.W.3d 477, 484 (Tex. 2018).

amended ordinance has caused to The Commons's property interest, not to challenge or invalidate the amended ordinance. The Commons indisputably possesses a vested interest in the property at issue and in the property's value.

Finally, we agree, of course, that "[c]onstitutional standing requires a concrete injury that is both traceable to the defendant's conduct and redressable by court order." *Tex. Bd. of Chiropractic Exam'rs v. Tex. Med. Ass'n*, 616 S.W.3d 558, 567 (Tex. 2021). The City argues that The Commons's claim in this case is not redressable because courts cannot determine whether the amended ordinance has caused a compensable taking when The Commons cannot provide specific information about proposed structures and elevations to enable a court to determine how the City would apply the amended ordinance. To the extent we understand this argument, for which the City relies on *Urban Developers LLC v. City of Jackson*, 468 F.3d 281 (5th Cir. 2006), it merely represents an alternative attempt to challenge ripeness. *See id.* at 287 (agreeing that none of the owner's claims "were ripe for review"), 294 (noting that the city "has not made a final decision on whether to condemn the property[] and has done nothing more than state its intent to proceed with condemnation"). We conclude that The Commons's takings claim is redressable because, if the amended ordinance has caused a compensable taking, damages awarded requiring such compensation "will remedy the alleged injury." *Meyers*, 548 S.W.3d at 485 (citing *Heckman v. Williamson County*, 369 S.W.3d 137, 155–56 (Tex. 2012)).

# IV.
## Conclusion

We hold that (1) The Commons *can* assert a valid regulatory-takings claim even though the City amended the ordinance as a valid exercise of its police power and to ensure compliance with the National Flood Insurance Program, (2) The Commons's claim is ripe for adjudication under these facts, and (3) The Commons has standing to assert its claim. We do not address whether The Commons has in fact asserted a valid regulatory-takings claim under *Lucas*, *Penn Central*, or the Texas Constitution's "damaged" provision. We reverse the court of appeals' judgment dismissing the claim and remand the case to the trial court for further proceedings.

Jeffrey S. Boyd
Justice

**OPINION DELIVERED:** March 21, 2025

30

# Automated Certificate of eService

This automated certificate of service was created by the efiling system. The filer served this document via email generated by the efiling system on the date and to the persons listed below. The rules governing certificates of service have not changed. Filers must still provide a certificate of service that complies with all applicable rules.

Kimberly Keller on behalf of Kimberly Keller
Bar No. 24014182
kim@kellsto.com
Envelope ID: 98770495
Filing Code Description: Other Brief
Filing Description: Appellant's Supplemental Authorities of Recently-Issued Precedent
Status as of 3/24/2025 7:03 AM CST

Associated Case Party: State Of Texas

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|--------------------|--------|
| Kellie E.Billings-Ray | | Kellie.Billings-Ray@oag.texas.gov | 3/22/2025 6:56:29 PM | SENT |
| Ian Lancaster | | ian.lancaster@oag.texas.gov | 3/22/2025 6:56:29 PM | SENT |
| Laura Courtney | | laura.courtney@oag.texas.gov | 3/22/2025 6:56:29 PM | SENT |
| H. CarlMyers | | Carl.Myers@oag.texas.gov | 3/22/2025 6:56:29 PM | SENT |
| James ScottMcCarley | | scott.mccarley@oag.texas.gov | 3/22/2025 6:56:29 PM | SENT |

Associated Case Party: Maurice E. "Pete" Moore, III, d/b/a Cypress Ranches

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|--------------------|--------|
| Kevin Dubose | | kdubose@adjtlaw.com | 3/22/2025 6:56:29 PM | SENT |
| Paul W.Green | | pgreen@adjtlaw.com | 3/22/2025 6:56:29 PM | SENT |
| Latonya McPherson | | lmcpherson@adjtlaw.com | 3/22/2025 6:56:29 PM | SENT |
| James T.Drakeley | | jdrakeley@spencerfane.com | 3/22/2025 6:56:29 PM | SENT |

Case Contacts

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|--------------------|--------|
| Karen LWatkins | | karen.watkins@oag.texas.gov | 3/22/2025 6:56:29 PM | SENT |
| C DixonMosty | | cdmosty@mostylaw.com | 3/22/2025 6:56:29 PM | SENT |
| Richard Mosty | | rmosty@mostylaw.com | 3/22/2025 6:56:29 PM | SENT |
| Jennifer SRiggs | | jriggs@r-alaw.com | 3/22/2025 6:56:29 PM | SENT |
| Kimberly SKeller | | kim@kellsto.com | 3/22/2025 6:56:29 PM | SENT |
| Clayton CUtkov | | cutkov@andrewsmyers.com | 3/22/2025 6:56:29 PM | SENT |